859 F.2d 1336
 57 USLW 2115, 109 Lab.Cas. P 10,624,
110 Lab.Cas. P 10,895
 OPERATING ENGINEERS PENSION TRUST, Operating Engineers
Health and Welfare Fund, Operating Engineers
Vacation-Holiday Savings Trust and
Operating Engineers Training
Trust, Plaintiffs-Appellants,
v.
A-C COMPANY, a California corporation, Defendant-Appellee.
 No. 85-5998.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1987.
Decided July 26, 1988.
As Amended on Denial of Rehearing and Rehearing En Banc Nov. 10, 1988.
 
 Wayne Jett, Jett & Laquer, Pasadena, Cal., for plaintiffs-appellants.
 Jerry D. Cluff, Pain, Cluff & Olson, San Diego, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before ALARCON, NELSON and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 In this case we consider several issues relating to the interpretation of an employee benefit trust fund agreement, including the question of how our prior decisions regarding that agreement can be reconciled. At least as important, we also consider significant questions pertaining to when the filing of a lawsuit may be deemed frivolous under Rule 11.
 
 I. FACTS AND PROCEEDING BELOW
 
 2
 Plaintiffs/Appellants are four employee benefit trusts (collectively referred to as "Trusts"). The Trusts were established pursuant to written collective bargaining agreements and declarations of trust between the International Union of Operating Engineers, Local Union No. 12, and various multi-employer associations in the construction industry in Southern California.[1]
 
 
 3
 Defendant/Appellee A-C Company ("A-C") is a California corporation engaged in construction engineering projects in Southern California. Since approximately May of 1974, A-C has been a member of the San Diego Engineering Contractors Association. By virtue of this membership, A-C is bound by the terms and conditions of the San Diego County Master Labor Agreement ("San Diego MLA"). The Joint Conference Board ("JCB") was established by the San Diego MLA to determine issues of interpretation regarding the San Diego MLA. On May 1, 1980, the JCB adopted a Resolution ("JCB Resolution") interpreting the San Diego MLA. The JCB Resolution requires that
 
 
 4
 [w]hen an employee has been dispatched by the Union to a contractor and the employee performs any work whatsoever covered by the Agreement, the contractor shall be obligated to pay fringe benefit contributions to the Trusts at the required rate for each and every hour worked by the employee or paid by the contractor. In the event the payroll records of the contractor show that such an employee is paid by salary or any method other than hourly wages, then the employee shall be presumed to have worked for a minimum of forty (40) hours during each week of such employment and payment, and fringe benefit contributions shall be paid for all such hours.
 
 
 5
 (Emphasis added).
 
 
 6
 The Trusts audited the books and records of A-C for the period March 1, 1979 through December 31, 1982 to determine if A-C had paid the contributions required under the San Diego MLA. On the basis of this audit the Trusts filed a complaint in the Central District of California, claiming that A-C had made insufficient contributions to the Trusts during the audit period on behalf of three of its employees, Robert O. Conley ("Robert"), Ronald O. Conley ("Ronald"), and Virgil J. Koch, in violation of section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185 (1982) and section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1132 (1980). Robert was President, Chief Executive Officer, and sole shareholder of A-C, while Ronald was Vice-President and Koch was Superintendent. A-C paid Robert, Ronald and Koch by a method other than hourly wages. Each of them periodically operated heavy construction equipment for A-C, which constitutes work covered by the San Diego MLA. A-C reported each individual to the Trusts as a covered employee.
 
 
 7
 Besides working for A-C, all three individuals also performed work for A-C Paving Company and A-C Asphalt Concrete Company (collectively referred to as "A-C Paving"). A-C Paving, a proprietorship, is a fictitious business name used by Robert to receive payments from A-C for rental of construction equipment that he owned. Robert is the sole owner of A-C Paving as well as A-C. In addition, Robert worked a ten hour week at A-C Union 76 ("A-C Union"), a gas station that he also owned, managed and operated. All three businesses were thus owned, managed and operated by Robert. Neither A-C Paving nor A-C Union was, or is, a signatory to the MLA. All three employees therefore split their time between MLA and non-MLA work, though all of their work was for businesses owned, managed and operated by Robert. Each of the three employees indisputably worked a total of 40 hours per week.
 
 
 8
 The Trusts allege that the San Diego MLA by virtue of the JCB Resolution requires that employers report and contribute to the Trusts on the basis of 40 hours per work week for all salaried or non-hourly employees who perform any MLA covered work whatsoever. The Trusts contend that the presumption set forth in that Resolution is conclusive, not rebuttable, and that because the employees performed some MLA work, A-C is required to contribute to the Trusts based on a 40 hour work week. The Trusts also contend that even if the presumption may be rebutted in the case of employees who work less than full time, the employer must still make contributions based on a 40 hour week in this case since the employees all worked a total of 40 hours a week, when both MLA and non-MLA work are included.
 
 
 9
 The Trusts claim unpaid contributions of $62,967.58, calculated on the basis of 40 hours per week minus the number of hours A-C reported and paid on behalf of the three employees during the audit period. The Trusts also seek recovery of liquidated damages, attorney's fees, audit expenses and interest on the unpaid contributions.
 
 
 10
 After a bench trial during which the district court ruled that it would not consider any evidence regarding the intended meaning of the JCB Resolution, the court held that the presumption contained in the Resolution is rebuttable and that the Trusts were entitled to only a small part of the amount claimed. It did so based on our holding in Sapper v. Lenco Blade, Inc., 704 F.2d 1069 (9th Cir.1983), where we construed the presumption language of a different resolution--i.e., the Labor Management Adjustment Board Resolution ("LMAB Resolution")--interpreting a different agreement--the Southern California Master Labor Agreement ("So. Cal. MLA"). In Lenco Blade, we held that under the So. Cal. MLA an employer may rebut the presumption that an employee worked a minimum of 40 hours a week. The presumption language of the LMAB Resolution is identical to the presumption language of the JCB Resolution, and there is no significant difference between the trust provisions of the So. Cal. MLA and the San Diego MLA.
 
 
 11
 Although this case is the first to require a court to interpret the presumption language of the JCB Resolution, the district court held that the Trusts were collaterally estopped from litigating its effect because the Trusts are essentially the same plaintiffs as in Lenco Blade where the issue regarding the presumption language of the LMAB Resolution was litigated.[2] The district court also held that A-C successfully rebutted the presumption that the three employees worked 40 hours per week because it proved that they worked less than that number of hours on MLA work, except for a sixteen month period during which A-C failed to rebut the presumption as to Robert. Accordingly, the court held that A-C owed the Trusts $10,110.40, the amount of contributions due for Robert, but that otherwise no contributions were owing. In reaching its decision, the district court did not include as hours worked the time the employees worked on non-MLA covered work.
 
 
 12
 Because the district court held that A-C owed the Trusts only a fraction of the nearly $63,000 of unpaid contributions claimed by the Trusts, the court denied the Trusts' request for attorney's fees. Furthermore, the district court held that in light of Lenco Blade, the Trusts' arguments were neither "warranted by existing law or good faith arguments for the extension, modification, or reversal of existing law", as required by Fed.R.Civ.P. 11. It then ordered the Trusts to pay A-C $10,000 as sanctions, which amount, according to the court, represented A-C's reasonable expenses, including attorney's fees.
 
 
 13
 The Trusts appeal. We reverse.
 
 II. ISSUE PRECLUSION
 
 14
 The district court held that the Trusts were precluded from litigating whether under the San Diego MLA, as interpreted in the JCB Resolution, there exists an irrebutable presumption that an employee who performs some MLA work has worked 40 hours per week. The court did so because of our Lenco Blade decision in which we construed the So. Cal. MLA and the LMAB Resolution. The district court was in error.
 
 
 15
 Issue preclusion prohibits relitigation of issues actually litigated and necessarily determined by a court. Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); Davis & Cox v. Summa Corp., 751 F.2d 1507, 1518 (9th Cir.1985); United States v. Geophysical Corp., 732 F.2d 693, 697 (9th Cir.1984). If the decision could have been rationally grounded upon an issue other than that which the defendant seeks to foreclose from consideration, issue preclusion does not prohibit relitigation of the asserted issue. Davis & Cox v. Summa Corp., 751 F.2d at 1518-19 (citing Ashe v. Swenson, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)).
 
 
 16
 Because the issue presented in this lawsuit involves an interpretation of the JCB Resolution, which applies to the San Diego MLA, and not the LMAB Resolution, which applies to the So. Cal. MLA, the issue was neither actually determined nor necessarily decided in Lenco Blade. The meaning of the San Diego MLA was never considered in Lenco Blade. In fact, the presumption language of the JCB Resolution has yet to be interpreted by any court.
 
 
 17
 Nevertheless, A-C argues that issue preclusion is appropriate because the LMAB and JCB resolutions use identical language, and because federal policy is " 'best effectuated' if collective bargaining agreements are interpreted and enforced in a uniform manner." Kemmis v. McGoldrick, 767 F.2d 594, 598 (9th Cir.1985) (Kemmis II ) (quoting Kemmis v. McGoldrick, 706 F.2d 993, 997 (9th Cir.1983) (Kemmis I )). While there does exist such a policy, and while that policy might lead us to conclude that the two agreements should be interpreted similarly, the question still is not one of issue preclusion. Rather, it involves the proper interpretation of collective bargaining agreements, and we recently rejected the notion that federal policy requires that different labor agreements with identical language be interpreted similarly since " 'a case by case analysis of the agreements involved provides the best evidence of the parties' intent.' " Kemmis II, 767 F.2d at 598 (quoting Construction Teamsters Health & Welfare Trust v. Con Form Constr. Corp., 657 F.2d 1101, 1103 (9th Cir.1981) and citing Zinser-Furby, Inc. v. San Diego County Dist. Council of Carpenters, 681 F.2d 1171, 1172 (9th Cir.1982) (per curiam)). Policy considerations can be overcome by evidence that goes to the intent of the agreement. However, the district court refused to consider such evidence. That was error. Nevertheless, in this instance we need not remand for the taking of evidence regarding the proper meaning of the collective bargaining agreement, or the Resolution, since we conclude below that the Trust Fund would be entitled to recover even if the San Diego provisions were to be given the identical interpretation as the Southern California ones.
 
 III. SPLIT TIME EMPLOYEES
 
 18
 Our cases interpreting the So. Cal. MLA require us to make a two step inquiry to determine whether an employer must contribute to the trust funds based upon a minimum of 40 hours a week. See generally Operating Engineers Pension Trust v. Charles Minor Equipment Rental, Inc., 766 F.2d 1301, 1304 (9th Cir.1985) and Waggoner v. C & D Pipeline Co., 601 F.2d 456, 458-59 (9th Cir.1979). First, we consider whether the employee worked a total of 40 hours a week, i.e., full time. At this first step in the inquiry, there exists a rebuttable presumption that a salaried or non-hourly employee has worked full time. Thus it is the employer's burden to demonstrate that the facts are to the contrary. If the employer rebuts the presumption, it may make contributions for less than 40 hours, based upon the actual hours worked.[3] If, however, the presumption is not overcome, we proceed to the next step. Here, the presumption once again comes into play. An employee who works full time is presumed conclusively to have worked a minimum of 40 hours a week performing MLA work, even though the employee may in fact have spent part of his time performing non-MLA duties. See, e.g., Waggoner v. Wm. Radkovich Co., Inc., 620 F.2d 206, 207 (9th Cir.1980); Burke v. Lenihan, 606 F.2d 840, 841 (9th Cir.1979); Waggoner v. C & D Pipeline Co., 601 F.2d at 458-59 (9th Cir.1979).
 
 
 19
 The confusion which exists concerning the proper interpretation of the So. Cal. MLA stems from Lenco Blade, 704 F.2d at 1072.[4] Prior to Lenco Blade, we had considered the presumption language of the So. Cal. MLA on three occasions. See, e.g., WM. Radkovich Co., Lenihan and C & D Pipeline Co. In all three cases we held that employees who performed MLA work were presumed to have worked a minimum of 40 hours a week and the employers were required to make contributions on that basis.[5] 5] In Lenco Blade we distinguished these cases on the ground that they involved employees who "indisputably" worked a minimum of 40 hours per week. 704 F.2d at 1072. We concluded that in none of the earlier cases had we considered whether the presumption that non-hourly employees worked that minimum period was rebuttable. Id.[6] The record in Lenco Blade showed that the employee involved in that case had been injured and may actually have worked less than 40 hours per week. We said that because there was a genuine issue of material fact as to whether the employee worked 40 hours per week, the employer could produce evidence to show that he had not.[7] Thus, we said that, at the first stage of our inquiry the presumption that an employee has worked a minimum of 40 hours a week is rebuttable. Subsequently, we followed Lenco Blade in Operating Engineers Pension Trust v. Charles Minor Equipment Rental, 766 F.2d 1301, 1304 (9th Cir.1985).
 
 
 20
 We have not previously considered the question whether Lenco Blade and Charles Minor Equipment Rental apply in cases in which the employee performs both MLA and non-MLA work. Neither Lenco Blade nor Charles Minor Equipment Rental is a split-time case. By contrast the employees here, like the employees in Wm. Radkovich Co., Lenihan and C & D Pipeline Co., all worked partly on MLA work and partly on non-MLA work. However, we need not decide here whether employers must contribute on a 40 hour per week basis for employees whose total work, including both MLA and non MLA work, is less than 40 hours per week. For in the present case each employee actually worked a total of 40 hours per week, counting both MLA and non-MLA work. Thus, the employer could not successfully rebut the first-step presumption and was required to make contributions on a full-time basis. The only difference between the present case and our previous split-time cases is that in this case some of the non-MLA work the employees performed was not for A-C but was for A-C Paving or A-C Union. We do not consider this distinction determinative since all three businesses are owned, managed and operated by Robert. Thus, A-C is liable for contributions on the basis of a minimum of 40 hours a week.
 
 
 21
 We observe that an important reason for the adoption of the JCB Resolution was to minimize the possibility that employers would manipulate accounting records to make it appear that employees were not performing MLA work. The Trusts argue, persuasively, that it would place an undue burden on most trust funds to require them to perform the investigatory accounting work necessary to ensure the accuracy of employer contributions where employers purport to split their employees' time between bargaining unit and nonbargaining unit work. Here, Robert, as the common owner, manager and operator of the three businesses, could readily manipulate the payroll records of all three businesses to show that his employees worked for A-C Paving or A-C Union when they were in fact performing MLA work for A-C.
 
 
 22
 For the above reasons, we hold that A-C is required to pay the Trusts fringe benefit contributions for the period at issue based upon a minimum of 40 hours per week for all three employees.[8]
 
 IV. AWARDS UNDER SECTION 1132(g)(2) OF ERISA
 
 23
 Section 1132(g)(2) of ERISA provides that when there is a judgment in favor of an employment benefit trust, the court shall award the trust unpaid contributions, interest on unpaid contributions, liquidated damages in some instances, and reasonable attorney fees.[9] The language "shall award" denotes that such an award is mandatory. See Operating Engineers Pension Trust v. Reed, 726 F.2d 513, 514 (9th Cir.1984). While attorney's fees are discretionary in the case of many ERISA claims, we have recognized on numerous occasions that attorney's fees are not discretionary in section 1132(g)(2) cases. See id. (citing Kemmis I, 706 F.2d 993, 997-98 (9th Cir.1983), and San Pedro Fishermen's Welfare Trust Fund v. DiBernardo, 664 F.2d 1344, 1346 (9th Cir.1982)).
 
 
 24
 Because we hold that the Trusts are the prevailing party, on remand they are entitled to all the relief mandated under section 1132(g)(2).[10] Under subsection (A), they should be awarded the full amount of unpaid contributions under subsection (B), they are entitled to interest on this amount. They should also receive the appropriate amount under subsection (C). The district court shall also award the Trusts reasonable attorney's fees pursuant to subsection (D). Furthermore, subsection (E) affords the court the opportunity to award such other legal or equitable relief as the court deems appropriate. The Trusts seek audit costs in addition to the other relief referred to above. Because an award of audit costs to the prevailing party is consistent with the policy of encouraging full and fair contributions, we hold that audit costs are recoverable under subsection (E). Upon remand, the district court shall determine the amounts due.
 
 V. SANCTIONS UNDER RULE 11
 
 25
 We next consider the propriety of the district court's award of sanctions to A-C under Rule 11, Fed.R.Civ.P. We have held that Rule 11 cases essentially require two different types of inquiries; one involves the "frivolousness" of the pleading and the other its purpose or objective. See, e.g., Zaldivar v. City of Los Angeles, 780 F.2d 823, 830 (9th Cir.1986). This case involves only the first type. The district court imposed sanctions in the sum of $10,000 because of the Trusts' "failure to recognize the clearly binding effect of Sapper v. Lenco Blade...." The court found that its award represented the reasonable expenses incurred by A-C, including reasonable attorney's fees, as a result of the Trusts' filing of the action.
 
 
 26
 We reverse that judgment. The award of sanctions in this case was wholly unwarranted. Not only are the Trusts' claims for unpaid contributions not frivolous in any respect, they are meritorious. Furthermore, we would be required to reverse the award of sanctions even if we agreed with the district court that the Trusts were not entitled to additional contributions. This is because the meaning of the San Diego MLA has not yet been interpreted by any court. It can hardly be deemed frivolous to argue that one labor agreement should be interpreted differently from another agreement with similar or identical language since, as we noted above, we have previously rejected the notion that federal policy requires that different labor agreements with identical language be interpreted similarly. Kemmis II, 767 F.2d at 598.[11]
 
 
 27
 Furthermore, we note that our statements in Lenco Blade that the presumption language in the So. Cal. MLA contained a rebuttable presumption could reasonably have been regarded as dicta by the Trusts. See supra note 7. It was not until Charles Minor Equipment Rental that a divided panel of this court ruled definitively that the presumption was initially rebuttable. The Trusts, however, filed this suit prior to our decision in that case. Thus, at the time this action was filed, C & D Pipeline arguably supported the Trusts' view of the presumption language, and Lenco Blade arguably was dicta going the other way. See supra note 11 and Part III.[12] Accordingly, even if the So. Cal. MLA controlled our interpretation of the San Diego MLA, the Trusts' argument that the presumption contained in the JCB Resolution was conclusive at all steps of the process was nevertheless a good faith one, entirely justified, as measured by any objective standard.
 
 
 28
 Finally, we observe that trust funds such as those at issue here have a statutory and fiduciary duty to collect contributions that are owed. To sanction them for vigorously trying to do so would run counter to the responsibility placed on them by Congress. See ERISA, 29 U.S.C. Sec. 1001 et seq. In fact, had the Trusts refrained from pursuing their legal remedies in this case, it might well have been argued that they failed properly to perform their obligations. Before imposing sanctions on trust funds, trustees, or their counsel, courts must consider the implications of the fiduciary duties and obligations placed on those entities and weigh that factor carefully in reaching their judgments.
 
 
 29
 Even aside from the fact that plaintiffs were trust funds, the imposition of sanctions in this case has implications well beyond this particular matter. The award, if upheld, would imply that attorneys in general should exercise little, if any, creativity in their representation of clients, that they should not argue for new but plausible interpretations of agreements, and that they should not read ambiguous cases in the way most favorable to their clients.
 
 
 30
 We emphatically reject this view, as did the Advisory Committee on the Federal Rules. The Committee's note to amended Rule 11 emphasizes that the Rule "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." Fed.R.Civ.P. 11, Notes of Advisory Committee on Rules, Federal Civil Judicial Procedure and Rules 34 (West 1987). Furthermore, as Justice Stevens has stated:
 
 
 31
 Freedom of access of the courts is a cherished value in our democratic society. Incremental changes in settled rules of law often result from litigation. The courts provide the mechanism for the peaceful resolution of disputes that might otherwise rise to attempts at self-help. There is, and should be, the strongest presumption of open access to all levels of the judicial system. Creating a risk that the invocation of the judicial process may give rise to punitive sanctions simply because the litigant's claim is unmeritorious could only deter the legitimate exercise of the right to seek a peaceful redress of grievances through judicial means.... [T]he strong presumption is against the imposition of sanctions for invoking the processes of the law.
 
 
 32
 Talamini v. All-State Insurance Co., 470 U.S. 1067, 105 S.Ct. 1824, 1827-28, 85 L.Ed.2d 125 (1985) (Stevens, J., joined by Brennan, Marshall and Blackman, concurring). We agree with Justice Stevens that judges must not, by imposing sanctions unnecessarily, discourage the filing of good faith actions. It is essential that free access to the judicial system be maintained; Rule 11 was not intended to impede such access.
 
 
 33
 Rule 11 must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously. Forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way. Our law is constantly evolving, and effective representation sometimes compels attorneys to take the lead in that evolution. Rule 11 must not be turned into a bar to legal progress. See, e.g., Hudson v. Moore Business Forms, Inc., 827 F.2d 450, 453-55 (9th Cir.1987) ("attempt to seek tort damages under a Seaman's-type action is not frivolous, but rather an attempt to expand a developing area of the law"). Courts must also "avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading ... was submitted." Id. The simple fact that an attorney's legal theory failed to persuade the district court "does not demonstrate that [counsel] lacked the requisite good faith in attempting to advance the law." Hurd v. Ralphs Grocery Co., 824 F.2d 806, 811 (9th Cir.1987). Rather, we reserve sanctions for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.
 
 
 34
 Finally, we observe that the inappropriate imposition of Rule 11 sanctions in this case is not an isolated occurrence. See, e.g, Note, Plausible Pleadings: Developing Standards for Rule 11 Sanctions, 100 Harv. L. Rev. 630 (1987); Snyder, The Chill of Rule 11, 11 Litigation, Winter 1985, at 16. Indeed, we have been required with some regularity to reverse district court awards of sanctions,[13] even in cases in which the party against whom sanctions were imposed prevailed on appeal. In Trident Center v. Conn. General Life Ins. Co., 847 F.2d 564 (9th Cir.1988), for example, we reversed both a district court's dismissal of the suit and its sua sponte sanctions award totalling $56,000. District courts simply must use more restraint than was employed here. Rule 11 is an extraordinary remedy, one to be exercised with extreme caution.
 
 
 35
 The district court's award of sanctions, as well as its determination on the merits, is reversed.
 
 
 36
 REVERSED AND REMANDED.
 
 
 
 [1]
 The Trusts include a pension trust, a health and welfare trust, a vacation and holiday trust, and a training trust
 
 
 [2]
 While the employer association parties to the two MLAs are different, the union party is the same. Apparently, signatories to both MLAs make contributions to the same trusts
 
 
 [3]
 This conclusion is certainly applicable if the employee performs only MLA work. The answer is less clear if the employee splits his time between MLA and non-MLA work. No case has yet considered whether contributions must be based on 40 hours a week for employees who actually work less than 40 hours but perform both MLA and non MLA work; nor need we decide that question here. See infra discussion at 1341
 
 
 [4]
 We do not consider here the reasonableness of our prior interpretations of the presumption language; we do note, however, that the express language of the Resolution seems to support the view that whenever a salaried or non-hourly employee works any amount of time on MLA work, the employer must make contributions to the funds on the basis of a minimum of forty hours. Nevertheless, we rejected that view in Charles Minor Equipment Rental
 
 
 [5]
 C & D Pipeline involved a salaried employee who divided his work time between work covered by the MLA and managerial duties not covered by the MLA. C & D Pipeline made contributions to the Trusts only for MLA work, and the district court permitted such conduct. We reversed, stating that the LMAB Resolution interpreting the So. Cal. MLA "requires employers to make fringe benefit contributions for all hours worked by (or paid) employees who perform any work covered by the agreement.... C & D was required to make contributions for [the employee] based on a minimum of 40 hours per week." 601 F.2d at 459. Similarly, in Waggoner v. Wm. Radkovich Co., Inc., 620 F.2d 206 (9th Cir.1980) (per curiam), we held that an employer whose non-hourly employee split his work time between an MLA job and a non-MLA position was required to contribute to the Trusts for all hours the employee worked. See also Burke v. Lenihan, 606 F.2d 840 (9th Cir.1979)
 
 
 [6]
 Lenco Blade 's characterization of the facts in C & D Pipeline, Wm. Radkovich and Burke is strongly disputed. See Operating Engineers Pension Trust v. Charles Minor Equipment Rental, 766 F.2d 1301, 1306 (9th Cir.1985) (Fletcher, J., dissenting). Judge Fletcher argues that the decision in C & D Pipeline "nowhere states or implies that [the employee] worked 40 hours per week, much less that this fact was undisputed." Operating Engineers Pension Trust v. Charles Minor Equipment Rental, Inc., 766 F.2d at 1306 (Fletcher, J., dissenting) (citing C & D Pipeline, 601 F.2d at 457-59). The same is true regarding Wm. Radkovich and Burke, according to Judge Fletcher. See id. (citing Wm. Radkovich, 620 F.2d at 206-07; Burke, 606 F.2d at 841). According to her dissent, then, these cases established that a conclusive presumption of a 40 hour work week exists whenever a non-hourly employee works any amount of time on MLA work
 
 
 [7]
 Lenco Blade was considered on a motion for summary judgment. Because issues of material fact remained as to whether the employee was paid by a method other than hourly wages, we remanded the case to the district court. We said that if the employee was not paid by hourly wages, the employer could then prove that the employee worked less than 40 hours per week. Id. at 1072. Because the court remanded for a determination of the issue whether the employee was paid by salary or hourly wage, Judge Fletcher argued that the additional statements in Lenco Blade regarding the 40 hour presumption were not the basis of the remand and therefore were dicta. Operating Engineers Pension Trust v. Charles Minor Equipment Rental, 766 F.2d at 1306-07 (Fletcher, J., dissenting). Such considerations are moot after Charles Minor Equipment Rental, in which we affirmed the approach outlined in Lenco Blade
 
 
 [8]
 In so holding, we do not reach the question whether the San Diego MLA should be treated differently from the So. Cal. MLA. We have accepted arguendo A-C's position that the two agreements should be construed identically, and, accordingly, have relied on cases interpreting the So. Cal. MLA. Because we conclude that the Trusts prevail under these cases, we need not consider their alternative argument that the two agreements should be interpreted differently and that contributions must be made under the San Diego MLA even when Lenco Blade and Charles Minor Equipment Rental would require a different result under the So. Cal. MLA
 
 
 [9]
 29 U.S.C. Sec. 1132(g)(2) provides:
 (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--
 (A) the unpaid contributions,
 (B) interest on the unpaid contributions,
 (C) an amount equal to the greater of--(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
 (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
 (E) such other legal or equitable relief as the court deems appropriate.
 For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.
 Section 1145, referred to in section 1132(g)(2), provides:
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 
 
 [10]
 We also hold that the Trusts have prevailed under 29 U.S.C. Sec. 185 of LMRA. However, since the Trusts seek the relief awarded under ERISA and not under the LMRA, we need not consider Sec. 185 further
 
 
 [11]
 We note that the Trusts sought to introduce the written declaration of a member of the JCB. The declaration stated that the presumption language of the JCB Resolution was intended to remove from the Trusts the burden of proving the actual hours worked by non-hourly employees. Furthermore, in 1980, when the JCB Resolution was agreed to, our leading case interpreting the presumption language of the LMAB Resolution was C & D Pipeline, which arguably held that the presumption was irrebutable on all questions. See supra discussion in Part III. See also Charles Minor Equipment Rental, 766 F.2d 1301, 1306 (Fletcher, J., dissenting). Thus, when the parties to the JCB Resolution agreed to the identical language in the LMAB Resolution, they may well have thought that they were adopting a rule requiring a wholly irrebutable presumption. While we do not rule on this question, we note that the Trusts' legal argument on this point is reasonable and in no way frivolous
 
 
 [12]
 In fact, Charles Minor was not decided until after the district court's decision in this case
 
 
 [13]
 See, e.g., United Energy Owners Committee, Inc. v. U.S. Energy Management Systems, Inc., 837 F.2d 356 (9th Cir.1988); Gonzales v. Parks, 830 F.2d 1033 (9th Cir.1987); Lemos v. Fencl, 828 F.2d 616 (9th Cir.1987); Garrett v. City and County of San Francisco, 818 F.2d 1515 (9th Cir.1987); Cal. Arch. Bldg. Prod. Inc. v. Franciscan Ceramics, 818 F.2d 1466 (9th Cir.1987); Golden Eagle Distributing Corp. v. Burroughs Corp., 801 F.2d 1531 (9th Cir.1986); Matter of Yagman, 796 F.2d 1165 (9th Cir.1986); Zaldivar v. City of Los Angeles, 780 F.2d 823 (9th Cir.1986)