Ronald CREE, Jr., et al., Plaintiffs,

v.

David W. WATERBURY,
et al., Defendants.

WHEELER LOGGING, Plaintiff,

v.

Roger W. BRUETT, et al., Defendants.

Nos. CY–89–458–AAM, CY–92–3100–AAM.

United States District Court,
E.D. Washington.

Nov. 29, 1994.

 

*lage of Gambell v. Babbitt,* 999 F.2d 403, 405 (9th Cir.1993).

Tim Weaver, Cockrill & Weaver, P.S., Yakima, WA, on behalf of Cree plaintiffs.

Jack Fiander, Yakama Indian Nation, Office of Legal Counsel, Toppenish, WA, on behalf of Wheeler plaintiffs as well as intervenor plaintiff, Yakama Indian Nation.

Asst. Atty. Gen. Fronda Woods, Olympia, WA, on behalf of defendants.

## ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

McDONALD, District Judge.

The court heard oral argument on November 10, 1994, on Plaintiffs' Motion for Partial Summary Judgment Re Meaning of "In

Common With" (Ct.Rec. 144)[1] and Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 100). Fronda Woods argued on behalf of defendants. Jack Fiander argued on behalf of *Wheeler Logging* plaintiffs as well as the intervenor plaintiff, Yakama Indian Nation. Tim Weaver argued on behalf of the *Cree* plaintiffs.

In addition, three other motions are before the court for resolution without oral argument: Defendants' Third Motion for Summary Judgment Dismissing Claims of Douglas Beebe (Ct.Rec. 61); Defendants' Motion for Summary Judgment Re Collateral Estoppel (Ct.Rec. 138); Defendants' Motion for Summary Judgment Dismissing Tribal Sovereignty Claims (*Wheeler* Ct.Rec. 60).

For the reasons discussed more fully below, the court is denying the defendants' motion for summary judgment based on collateral estoppel and defendants' motion for summary judgment regarding treaty claims. The court is granting defendants' summary judgment motion to dismiss the claims of individual plaintiff, Douglas Beebe, and the court is also dismissing any of plaintiffs' claims which are based on tribal sovereignty. Finally, the court is granting plaintiff's summary judgment motion for a declaration regarding the Treaty right to travel under Article III of the Treaty with the Yakamas.

## SUMMARY:

Although it repeats the efforts of its prior orders, the court once again reviews the facts of these consolidated cases for the record. The plaintiffs in *Cree* operate logging trucks that haul logs from tribal timber sales on reservation lands to off-reservation markets. Plaintiff Richard Ramsey is the owner of Tiin–Ma Logging Company. The other named plaintiffs are employed as drivers for Tiin–Ma. Aside from Douglas Beebe, all of the plaintiffs are enrolled Yakama Indians. Plaintiff Douglas Beebe, who also drives for Tiin–Ma, is an enrolled member of the Makah Tribe.

Defendants are officers authorized to issue traffic citations for violations of truck licensing and permitting statutes.[2] The defendant officers have issued traffic citations to Tiin–Ma's drivers because Tiin–Ma has not paid certain licensing fees and has not obtained certain permits for its trucks. Plaintiffs claim that the Treaty with the Yakamas protects their right to haul tribal timber to market over state highways without having to pay the contested licensing and permit fees. They allege that the officers, acting under color of state law,[3] have deprived plaintiffs of their rights under federal law, the Constitution, and the Treaty with the Yakamas. They also claim that their transportation of logs was subject to federal preemption pursuant to the Indian Commerce Clause.

Plaintiffs seek damages and attorney's fees under 42 U.S.C. § 1983 and § 1988. They further seek injunctive relief preventing de-

---

1. Because these cases have been consolidated, many documents have been filed in both actions. Any document filed in both actions has two distinct court record numbers, one for each file. For simplicity's sake, the court will, wherever possible, reference only the court record number from the *Cree* file. Accordingly, unless otherwise indicated, all court record numbers used in this document refer to the *Cree* file.

2. All claims against the State of Washington were previously dismissed by the court in its Order re: Summary Judgment (Ct.Rec. 49).

3. The fees imposed by the State of Washington which plaintiffs challenge are located at RCW §§ 45.16.070 (requiring vehicle tonnage licenses); 46.16.135 (providing for monthly payment of tonnage licenses and also noting that operation of vehicle after expiration of monthly license is traffic infraction); 46.44.047 (special log toler-ance weight permits); 46.44.095 (annual additional tonnage permits).

RCW §§ 46.16.135, 46.16.140, 46.16.145 establish traffic infractions for violations of the weight licensing requirements and impose penalties for such violations. It is important to note that at oral argument on November 10, 1994, counsel for both *Wheeler* and *Cree* plaintiffs agreed that the collective plaintiffs were *not* challenging the State of Washington's ability to impose weight regulations upon the Yakamas. Their challenge is limited solely to the imposition of licensing and permitting fees. Consequently, the collective plaintiffs agreed that they are not challenging any monetary penalties imposed for violations of these weight regulations. Rather, they simply assert that citations and penalties cannot be imposed *solely* due to their failure to obtain the weight licenses and permits, where they are otherwise in compliance with the weight regulations.

fendants or other similarly situated officers from interfering with plaintiffs' treaty secured rights to use the public highways of the State of Washington for their logging enterprise without complying with Washington State use and excise [4] tax laws and regulations. Finally, they seek a declaration of plaintiffs' right under the Treaty with the Yakamas to use the state's highways without having to pay the contested fees or taxes.

On June 1, 1991, the court granted plaintiffs' motion for a preliminary injunction. Findings of Fact, Conclusions of Law, and Order (Ct.Rec. 48). The court enjoined defendants from issuing citations to Tiin–Ma Logging Company or its drivers for violations of the laws of Washington that are based on the failure to obtain tonnage licenses under RCW 46.16.070 or the failure to obtain log tolerance permits under RCW 46.44.047. The court further enjoined defendants from impounding or threatening to impound Tiin–Ma's trucks for similar violations.

On June 17, 1991, the court issued an order granting in part and denying in part defendants' first motion for partial summary judgment. Order re: Summary Judgment (Ct.Rec. 49). The court granted the motion to dismiss all claims against the State of Washington; granted the motion to dismiss all claims for damages against the defendant officers in their official capacities; and granted the motion to dismiss the claims for injunctive relief against defendant Waterbury as he was no longer employed by the State Patrol. The court denied defendants' motion, based on qualified immunity, to dismiss the damages claims against the officers in their individual capacities. Finally, the court granted plaintiffs' motion to amend the complaint by adding the name of the head of the Washington State Patrol or the State Patrol officer with supervisory authority over the Washington State Patrol's commercial vehicle enforcement officers.

On appeal, the Ninth Circuit Court of Appeals reversed this court's ruling on qualified immunity. (Ct.Rec. 80). The Circuit held that the officers were entitled to qualified immunity since the treaty right claimed was not clearly established at the time they issued the citations. After this court's ruling on summary judgment and the Ninth Circuit's ruling on appeal, the following claims remain in the *Cree* action: plaintiffs' claim for declaratory relief regarding their treaty right to use the state's highways without having to pay the contested fees; plaintiffs' claim for permanent injunctive relief against the individual officers and the head of the Washington State Patrol regarding failure to comply with the licensing and fee provisions at issue; and plaintiffs' claim for attorney's fees under 42 U.S.C. § 1988.

Plaintiffs in *Wheeler Logging* are similarly situated to plaintiffs in *Cree*. They are a Yakama Indian owned logging company and its owner, Delbert Wheeler. Defendants are Roger Bruett, Chief of the Washington State Patrol, and Clyde Lucas, a commercial vehicle enforcement officer with the Washington State Patrol.

Plaintiffs in *Wheeler Logging,* like plaintiffs in *Cree,* claim that the enforcement of Washington traffic laws relating to vehicle weight licenses and log tolerance permits violates their rights under the Treaty with the Yakamas. Complaint in a Civil Action (*Wheeler* Ct.Rec. 1). Plaintiffs allege that the defendants, acting under color of state law, have deprived plaintiffs of their rights under the Treaty and under the Constitution. They additionally claim that defendants' conduct infringes upon their right of self-government as members of the Yakama Indian Nation. (*Wheeler* Ct.Rec. 1 at 5). They pray for declaratory judgment regarding their right to carry tribal timber to market over state highways free from the obligation to pay the licensing and permitting fees at issue. They further pray for permanent injunctive relief restraining defendants from issuing citations to plaintiffs or impounding plaintiffs' trucks for traffic violations based on the failure to obtain tonnage licenses under RCW 46.16.070 or 46.16.135, or the failure to obtain log tolerance permits under RCW 46.44.047. Finally, plaintiffs pray for an award of costs and fees pursuant to 42

---

**4.** Although plaintiffs initially challenged RCW § 82.38.100, which imposes an excise tax upon special trip permits, this portion of their complaint has been dismissed. (Ct.Rec. 12).

U.S.C. § 1988. None of the claims in *Wheeler Logging* have been dismissed at this time.

On September 18, 1992, the court granted the *Wheeler Logging* plaintiffs' motion for a preliminary injunction. The terms and conditions of the injunction are essentially identical to those of the injunction issued in *Cree.* Because the legal issues in the two cases are nearly identical, the court consolidated the cases on March 6, 1993.

On May 11, 1994, the court ordered the plaintiffs to show cause why their claims should not be dismissed pursuant to the Tax Injunction Act. (Ct.Rec. 112). The court suggested in that order that the parties address the issue of whether the Yakama Indian Nation should be allowed to intervene in the action.

On August 29, 1994, the court entered an order dismissing, for lack of subject matter jurisdiction due to the Tax Injunction Act, any individual plaintiff's claim which challenges the financial obligations under the truck licensing and permitting laws at issue. (Ct.Rec. 133). However, the court noted that it retained subject matter jurisdiction over any individual plaintiff's claim that challenges the licensing and permitting requirements per se, that is, as distinct from the financial obligations imposed by those requirements.[5] (Ct.Rec. 133 at 27). The court also granted the Yakama Indian Nation's motion to intervene as a party-plaintiff in both the *Cree* and *Wheeler* actions. The Yakama Indian Nation's proposed complaint was filed pursuant to that order. *See* (Ct.Rec. 134).

Currently before the court are five motions for summary judgment regarding these two consolidated cases. Defendants have filed a motion for summary judgment dismissing the claims of *Cree* plaintiff, Douglas Beebe, who is not a member of the Yakama Indian Nation. (Ct.Rec. 61). This motion was initially stayed by the court's order. (Ct.Rec. 70).

The second of five is defendants' motion for summary judgment dismissing tribal sovereignty claims (*Wheeler* Ct.Rec. 60). That motion is based in part on the argument that individual tribal members may not sue to enforce rights held in common by the Tribe. Defendants have also filed a motion for summary judgment based on collateral estoppel. (Ct.Rec. 138). These three motions came up for hearing *without* oral argument on November 7, 1994.

Finally, defendants have filed a motion for summary judgment dismissing the treaty rights claimed by plaintiffs. (Ct.Rec. 100). Plaintiff Wheeler Logging in turn filed a motion for summary judgment regarding the meaning of "in common with." (Ct.Rec. 144). *Cree* plaintiffs filed a notice joining with Wheeler Logging in this motion. Defendants' and plaintiffs' motions are essentially cross-motions regarding the interpretation of Article III of the Treaty with the Yakamas.

**DISCUSSION:**

**A. Summary Judgment Standard**

■ The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir.1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

---

5. Although the court retained jurisdiction to hear such challenges to the state's power to regulate per se, counsel for plaintiffs conceded at oral argument on November 10, 1994, that plaintiffs are subject to regulations imposed by the State of Washington, which are designed to preserve and maintain the highways. Counsel stated that plaintiffs' challenge is directed solely towards the state's ability to impose licensing and permitting fees on the plaintiffs' use of these highways. Thus, based on the court's Order Re: Subject Matter Jurisdiction, Intervention, individual plaintiffs do not appear to have any substantial claim remaining in this case.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

At the summary judgment stage, the court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. In resolving these issues, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987); *see also Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

**B. Defendants' Motion for Summary Judgment Regarding Collateral Estoppel**

■ In their motion for summary judgment dismissing all claims of the Yakama Indian Nation on the basis of collateral estoppel (Ct.Rec. 138), defendants argue that the issue of whether Article III of the Treaty precludes the state from collecting its road taxes from the Yakama Indians was necessarily determined adversely to the Tribe [6] in the Supreme Court decision, *County of Yakima v. Yakama Indian Nation*, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). The Yakama Indian Nation and the *Cree* plaintiffs have both responded to this motion. (Ct. Recs. 156, 158). In response, plaintiffs argue that the issue decided in *County of Yakima* was distinct from the issue regarding Article III in this case, and that this issue was not "actually litigated"; therefore, collateral estoppel should not bar litigation of this issue.

**1. Facts Material to the Collateral Estoppel Motion**

The following facts are taken primarily from the defendants' LR 56 statement of material facts (Ct.Rec. 141).[7] Pursuant to LR 56(c), any material fact stated by a moving party and not rebutted by a non-moving party is deemed admitted. There are no disputes of material fact pertaining to this motion.

Yakima County has had authority to levy property taxes to pay for county roads and has been creating such roads since prior to 1900. The County currently levies ad valorem property taxes, a portion of which goes into a road fund which is used to maintain and construct such roads.[8]

In *Confederated Tribes and Bands of the Yakima Nation v. County of Yakima*, No. C–87–0654–AAM, the Yakima Indian Nation challenged Yakima County's collection of ad

---

**6.** The court, at various points throughout this document for the sake of simplicity, refers to the Confederated Tribes and Bands of the Yakama Indian Nation as the "Tribe."

**7.** Plaintiff Yakama Indian Nation did not file a separate statement of material facts; however, plaintiff has attached copies of the Complaint and the court's Order regarding summary judgment in CY–654–AAM. The court also notes that while *Cree* plaintiff's have submitted a separate LR 56 statement of material facts (Ct.Rec. 162), all of its enumerated points constitute legal conclusions rather than valid statements of material facts. (E.g. "5. That neither the Yakama Nation

nor Yakima County raised the issue of Article III in that case because it was not a necessary issue to the resolution of that case").

**8.** In his affidavit, Ray Hall, Assessor for Yakima County, notes that out of each $1000 of ad valorem property tax revenues, Yakima County uses $2.25 for the county road fund. This road fund is dedicated to the construction and maintenance of roads and bridges in Yakima County. *See* Affidavit of Ray Hall attached as Exhibit B to Affidavit of Fronda Woods Re Defendants' Motion for Summary Judgment Re Collateral Estoppel, (Ct.Rec. 143).

valorem property taxes from the Yakamas. On cross-motions for summary judgment, the Yakamas stipulated that the Yakima County Public Works Department made various expenditures on the maintenance and construction of county roads, some portion of which applied to roads inside the Yakima Indian Reservation. (Ct.Rec. 141 at 2).

## 2. Collateral Estoppel Standard

■ Under the doctrine of collateral estoppel, or claim preclusion, "[a] party that has once litigated a factual or legal issue and lost may be precluded from relitigating the same issue in a subsequent proceeding." *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1978); *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Connors v. Tanoma Min. Co.,* 953 F.2d 682, 684 (D.C.Cir.1992). In order for a claim to be precluded, the following must be shown:

> First, the same issue *must have been actually litigated, that is, contested by the parties and submitted for determination by the court.* Second, the issue must have been *actually and necessarily* determined by a court of competent jurisdiction in the first trial. Third, preclusion in the second trial must not work an unfairness (emphasis added).

*Id.; Yamaha Corp. of America v. United States,* 961 F.2d 245 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993), *reh'g denied,* —— U.S. ——, 113 S.Ct. 1436, 122 L.Ed.2d 802 (1993); *see also Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1320 (9th Cir.1992):

> To foreclose relitigation of an issue, "(1) the issue *must* be identical to the one alleged in the prior litigation; (2) the issue must have been *actually* litigated ...; (3) the determination of the issue in the prior litigation must have been a *critical and necessary part of the judgment* in the earlier action (emphasis added).

The Ninth Circuit has been cautious in its application of the doctrine. *See Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391 (9th Cir.1992) ("The doctrine of collateral estoppel applies only when the issues presented in each matter are identical. The doctrine is inapplicable if the issues are merely similar"). "If a decision could have been rationally grounded upon an issue other than that which the defendant seeks to foreclose from consideration, issue preclusion does not prohibit relitigation of the asserted issue." *Operating Engineers Pension Trust v. A–C Co.,* 859 F.2d 1336, 1339 (9th Cir.1988); *Clark,* 966 F.2d at 1321.

■ The burden of showing "with clarity and certainty what was determined by the prior judgment" rests with the party asserting preclusion. *Id.* (citing *United States v. Lasky,* 600 F.2d 765, 769 (9th Cir.1972), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979)).

## 3. *County of Yakima v. Yakima Indian Nation*

Pursuant to their action in *County of Yakima v. Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), the Yakamas contended that through the Indian Reorganization Act of 1934, Congress impliedly repealed Section 6 of the General Allotment Act and the 1906 amendment to that section, known as the Burke Act.[9] The Tribe argued that by terminating the allotment program and restoring tribal integrity through the Indian Reorganization Act, Congress retracted the states' jurisdiction to tax this fee-patented land. *Id.* 502 U.S. at 259–61, 112 S.Ct. at 689.

The Supreme Court rejected the Tribe's argument, holding that the Indian Reorganization Act of 1934 did not repeal the states' jurisdiction to impose taxes upon this land. *Id.* 502 U.S. at 261–65, 112 S.Ct. at 690–91. Thus, since the General Allotment Act and the Burke proviso manifested a clear intention to permit the state to tax such Indian lands, *see id.* 502 U.S. at 257–59, 112 S.Ct. at 688, Yakima County could impose an ad valorem tax on reservation land patented in fee pursuant to the General Allotment Act and

**9.** Together, these provisions authorized the Secretary of the Interior, when satisfied that an Indian allottee was competent, to issue such allottee land in fee simple, and it also provided that *"thereafter all restrictions as to ... taxation of said land shall be removed* (emphasis added).

owned by reservation Indians or the Yakama Indian Nation itself. *Id.* 502 U.S. at 269–71, 112 S.Ct. at 694.

However, the Court ruled that the Allotment language could not be extended to permit an excise tax on *sales* of fee land. *Id.* 502 U.S. at 267–69, 112 S.Ct. at 693. The Court stated:

> The short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of ... land,' not 'taxation of transactions involving land,' or 'taxation based on the value of land.' ... Accordingly, Washington's excise tax on sales of land cannot be sustained.

*Id.* 502 U.S. at 269–70, 112 S.Ct. at 694. In ruling that the language in the Allotment Act permitted the ad valorem taxation on real property, the Court noted that "[l]iability for the ad valorem tax *flows exclusively from the ownership of realty* on the date of assessment. *The tax, moreover, creates a burden on the property alone* (emphasis added)." *Id.* 502 U.S. at 266, 112 S.Ct. at 692. Thus, the Court confined its holding to allow only Washington taxes based upon the *ownership* of this fee land.

### 4. Analysis of Parties' Arguments

Defendants' motion depends largely upon the fact that a portion of the ad valorem taxes imposed upon the fee lands held by the Yakamas actually goes into a "county road fund" which is used to construct and maintain county roads. *See* (Ct.Rec. 140 at 7). From this premise, defendants argue that since the Supreme Court, in *County of Yakima v. Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) held that these ad valorem taxes were authorized by the General Allotment Act, the Court "necessarily", or implicitly, determined that Article III of the Treaty does not contain a "road tax exemption." (Ct.Rec. 140 at 7). However, upon examination, the court finds that the record fails to establish any of the required elements of collateral estoppel.

### a. The Issues Are Not Identical

■ Under the prevailing law, defendants bear the burden of demonstrating precisely what the issue determined in *County of Yakima* was and how it is identical to the issue in this case. The defendants assert that the issues are identical because the ad valorem property taxes challenged in *County of Yakima* were partially used to construct and maintain roads, thus making both *County of Yakima* and this case challenges to "road taxes." *See* Defendants' Memorandum in Support of Summary Judgment Re Collateral Estoppel (Ct.Rec. 140 at 7–8). Plaintiffs' response is that this is an improper characterization, based upon the Supreme Court's opinion.

As the discussion of *County of Yakima* indicates, the Supreme Court defined the tax permitted by the General Allotment Act narrowly, by referring to the subject of that tax: ownership of the fee-patented realty. *See* Cree Plaintiffs' Memorandum In Opposition to Defendants' Motion for Summary Judgment Re: Collateral Estoppel (Ct.Rec. 158 at 2). The Court found that the Act did describe the range of the states' jurisdiction to tax: a jurisdiction which was limited to taxes based solely on ownership of land, and consequently, the Court refused to permit any other types of tax. *County of Yakima,* 502 U.S. at 267–69, 112 S.Ct. at 693. In defining permissible taxes, the Court looked to the taxable subject or event (e.g. *ownership* of property, *sale* of property, *value* of property), not the use to which the proceeds of these taxes were put. Defendants' assertion that the fact that a small percentage of the revenue from the ad valorem property tax is diverted to the road fund makes it a "road tax" ignores the Supreme Court's own analysis in determining the nature of the tax challenged. In the current litigation, the subjects of the challenged taxes [10] are not real property but trucks: "[T]here shall be paid and collected annually for *each* motor truck, truck tractor, road tractor ... the following licensing fees by such gross vehicle weight (emphasis added)." RCW 46.16.070.

---

10. This court has already determined that the various fees contested by the plaintiffs in this case are "taxes." Order Re: Subject Matter Jurisdiction, Intervention (Ct.Rec. 133 at 11).

Thus, *County of Yakima* and the present case involved two different types of taxes.

Defendants suggest in their reply that while the two taxes may have different subject-matter, they are alike because in both cases people pay them. Reply Memorandum in Support of Defendants' Motion for Summary Judgment Re: Collateral Estoppel (Ct. Rec. 165 at 2). The court finds this argument unconvincing, since under that analysis all taxes can be considered identical. The Supreme Court explicitly refused to adopt such an absurd analysis: "[A] tax upon the sale of property is not a tax upon the subject matter of that sale." *County of Yakima*, 502 U.S. at 267–69, 112 S.Ct. at 693 *quoting, Mahler v. Tremper*, 40 Wash.2d 405, 409, 243 P.2d 627 (1952).

Defendants further argue that if the subjects of the tax are determinative of their nature, then the present case cannot implicate Article III of the Yakama Treaty. (Ct. Rec. 165 at 3). They claim that such a tax would, under this analysis, be a tax upon the operation of heavy vehicles on public highways not a "tax on Yakama Indians" and therefore not subject to an exemption under Article III. (Ct.Rec. 165 at 3). However, defendants fail to explain why it would not be possible to construe the Treaty language as carving out an exemption for the Yakama Indian Nation regarding this particular type of tax.

In sum, while these taxes may be similar in that they share some of the same applications, similarity of issues is not a sufficient ground for collateral estoppel. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391 (9th Cir.1992).

### b. The Article III Issue Was Not *Actually* Litigated or Determined by the Supreme Court

In order for collateral estoppel to apply, it must be demonstrated that the issue sought to be precluded was actually contested by the parties and determined by a court of competent jurisdiction. *Connors v. Tanoma Min. Co.*, 953 F.2d 682, 684 (D.C.Cir. 1992); *Commissioner v. Sunnen*, 333 U.S. 591, 598, 68 S.Ct. 715, 719–20, 92 L.Ed. 898 (1947) ("[M]atters which were actually litigated and determined in the first proceeding cannot later be relitigated").

To meet this requirement, defendants refer to the stipulation made by the Yakamas in the *County of Yakima* case that Yakima County spends money on the construction and maintenance of roads.[11] *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment Re Collateral Estoppel (Ct.Rec. 165 at 4). Defendants assert that this stipulation "shows that the *issue* of whether taxes levied for roads could be validly be collected was raised and actually litigated." (Ct.Rec. 165 at 5). However, this stipulation mentions nothing about Article III of the Treaty with the Yakamas and its effect upon the State-imposed fees at issue; in fact, the stipulation does not address the imposition of any type of taxes upon the Yakamas. Defendants even agree with *Cree* plaintiffs' response that "the intention of the stipulation was simply to reflect what each party was contributing in tax dollars and service on the Reservation." (Ct. Rec. 158 at 5).

Both plaintiff Yakama Indian Nation and the *Cree* plaintiffs make compelling arguments that this stipulation in no way subjected the Article III issue to an adversarial presentation. *See* (Ct.Rec. 156 at 4). They cite *Sekaquaptewa v. MacDonald*, 575 F.2d 239, 247 (9th Cir.1978) for the rule that for collateral estoppel, an issue will not be deemed to have been "actually litigated" if it is the subject of a stipulation between the parties.

---

11. The stipulation reads:
 Yakima County owns and maintains 1,770 miles of roads, 490 miles of which are within the Yakima Indian Reservation. In 1987, the Yakima County Public Works Department expended $5,017,162 on maintenance of County roads, including $1,031,674 on the 490 miles of County roads within the Yakima Indian Reservation. In 1987, Yakima County Public Works also expended $3,755,368 on County road construction, including $586,253 on road construction within the Yakima Indian Reservation.
 Stipulation of Facts for Summary Judgment, *Confederated Tribes and Bands of the Yakima Indian Nation v. County of Yakima*, No. C–87–0654–AAM (E.D.Wash. Apr. 26, 1988).

The court finds that this rather insignificant stipulation was undertaken simply to provide some detail regarding Yakima County's distribution of tax revenues. *Sekaquaptewa* reinforces the fact that this stipulation did not litigate anything.

Defendants additionally claim that even though "nobody mentioned the Treaty road clause," collateral estoppel is not barred because the Article III subject is just a new "argument" not a new "issue." (Ct.Rec. 165 at 6). Defendants cite as authority for this assertion, *Yamaha Corp. of America v. United States,* 961 F.2d 245, 254 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993), *reh'g denied,* —— U.S. ——, 113 S.Ct. 1436, 122 L.Ed.2d 802 (1993), which provides:

> Furthermore, once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments made in support of it in the first case (emphasis in original).

Defendants apparently claim that Article III is just a new "argument" against the imposition of those "road taxes" authorized by the Supreme Court in *County of Yakima.* However, as discussed more fully in the above section, Article III is distinct from the "issue" actually litigated in *County of Yakima:* whether the General Allotment Act authorized imposition of property taxes. Thus, whether Article III exempts the Yakamas from road taxes is a new issue not a new argument, and defendants' concession that Article III was not ever mentioned shows clearly that this issue was not "actually litigated."

### c. The Article III Issue Was Not Essential To the Supreme Court's Opinion

Another element that defendants must establish to successfully preclude the issue at stake in this case is that it was "essential" to the Supreme Court's decision in *County of Yakima.* Their argument is again premised on the assertion that since a portion of the ad valorem tax revenues go to the road fund, they must be "road taxes." *See* Memorandum in Support of Defendants' Motion for Summary Judgment Re Collateral Estoppel (Ct.Rec. 140 at 7). They claim that the Supreme Court could not have held as it did in *County of Yakima* unless it implicitly determined that the Yakamas are not exempt from such road taxes. (Ct.Rec. 165 at 5).

The defendants argue that the Article III issue had to have been addressed by the Court because otherwise there is no way they could have reached their ultimate conclusion regarding the General Allotment Act. (Ct.Rec. 165 at 5). Defendants' unsupported assertion fails, because as long as the Supreme Court's decision *could* have been rationally grounded upon an issue other than the one defendants seek to foreclose, then the issue was not critical and necessary. *Operating Engineers Pension Trust v. A–C Co.,* 859 F.2d 1336, 1339 (9th Cir.1988). Not only "could" the Supreme Court have based its decision upon an issue other than Article III, this court finds that the *sole* basis for the Supreme Court's decision was its finding that the General Allotment Act authorizes only these specific ad valorem property taxes. This is not just a "rational" construction, but in fact the only actual ground for the Supreme Court's decision.

Defendants' interpretation is novel: that the Supreme Court necessarily addressed this Article III issue tacitly, notwithstanding that this issue was fundamental to its decision. The court finds defendants' interpretation to reflect an uncommon shyness from a body that ordinarily provides explicit reasons for its rulings. Rather than presume this aberrational explanation, the court is inclined to believe that the decision dealt only with the issue before it. The interpretation of the Article III travel provision in the Treaty with the Yakamas was not such an issue.

### d. Conclusion

In order to successfully prevail on their collateral estoppel claim, defendants must show: (1) that the issue in the prior case was identical to the current issue; (2) that the issue was actually litigated and determined by a court; (3) that the issue was essential to the prior decision. Having failed to demonstrate any of the required elements, defendants' motion for summary judgment based on collateral estoppel must be denied.

## C. Defendants' Motion for Summary Judgment Dismissing Tribal Sovereignty Claims

█ Plaintiff Delbert Wheeler alleges that defendants' conduct infringes his right of self-government as a voting age member of the Yakama Indian Nation. (*Wheeler* Ct. Rec. 1 at 5). The Yakama Indian Nation adopted this claim in its complaint in intervention. (Ct.Rec. 134). Pursuant to this, defendants have filed a motion for summary judgment dismissing any claims based upon tribal sovereignty. (*Wheeler* Ct.Rec. 60). Defendants assert that, as a matter of law, no independent claim for equitable relief can be based solely upon infringement of the Yakamas' tribal sovereignty. Defendants also argue that even if such claim is deemed to exist by the court, plaintiffs have failed to allege specific facts creating a genuine issue for trial on such a claim. Finally, they assert that if tribal sovereignty itself can provide the basis for an independent claim, such claim inheres to the Tribe alone and not to any of its individual members.

Plaintiffs, in response, contend that caselaw supports the assertion of their claim for equitable relief based upon the defendants' infringement upon both the Tribe's right to govern its members and the members' right to be governed by Tribal law.

### 1. Rule 56 Provides the Applicable Standard Governing This Motion

In their response, plaintiffs assert that since the defendants' motion is based upon an argument that plaintiffs and intervenors have alleged a claim for which relief may not be granted, the applicable standard governing this motion is set forth in Fed.R.Civ.Proc. 12(b)(6). Plaintiffs further claim that this standard of law requires that their claim not be dismissed unless it appears to a certainty that they would not be entitled to relief under *any* set of facts that could be proved. *See* Plaintiffs' Memorandum Re Tribal Sovereignty Claims (Ct.Rec. 122 at 2).

However, defendants correctly point out that Rule 12 itself mandates that this motion be evaluated according to the standard of Rule 56:

If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to, and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of *as provided in Rule 56* (emphasis added).

The defendants have filed their motion along with an accompanying statement of material facts and affidavits not contained in the pleadings, and the court is considering these materials in its assessment of this motion. Also, plaintiffs themselves have filed an affidavit along with their response to the defendants' motion. Consequently, the court finds it appropriate to apply the standard of Rule 56 as set forth above in deciding this motion.

### 2. Facts Material to Tribal Sovereignty Motion

The following facts are excerpted from defendants' statement of material facts, submitted pursuant to LR 56(a). Plaintiffs have not filed such a statement; however, they have submitted an affidavit in support of their response, upon which the court may rely. *See* Affidavit of John Vitello (Ct.Rec. 123). There is no dispute of material fact with regard to this motion.

Except for certain federal and tribal governmental trucks, trucks from all western states must have Washington licenses when using Washington roads at weights above 26,000 pounds, and Washington also requires log tolerance permits for certain overweight trucks. All fees for these licenses and permits are credited to the state motor vehicle fund and are used exclusively for highway purposes. These licensing and permitting fees can be prorated to reflect the amount of time that Wheeler Logging's trucks use highways outside the Yakama Indian Reservation. All of the state enforcement actions challenged in *Wheeler Logging* happened outside the boundaries of the Yakama Indian Reservation.

Plaintiff Wheeler Logging hauls logs to various sites in Washington. Defendants have issued citations for Wheeler Logging's failure to obtain the licenses and permits for overweight trucks required by Washington law.

*Wheeler Logging* plaintiffs have challenged defendants' conduct by claiming that it "infringes plaintiff's rights of self-government as a voting age member of the Yakima Indian Nation to participate in making his own laws and being governed by them." *See* Complaint in a Civil Action attached to Affidavit of Fronda Woods Re Defendants' Motion for Summary Judgment Dismissing Tribal Sovereignty Claims. (*Wheeler* Ct.Rec. 64). The Yakama Indian Nation and Delbert Wheeler have incorporated this complaint. Logs which are transported from the Yakama Reservation by Wheeler Logging, or any logging company contracted to harvest and transport Yakama tribal timber, are the property of the Yakama Indian Nation. Title remains in the Tribe until such logs are scaled, at which time they become the property of the purchaser. Ordinarily, such scaling takes place outside the Reservation.

### 3. Analysis of Parties' Arguments

Besides their claim that defendants' actions constitute impermissible interference with their Treaty protected right to travel, *Wheeler Logging* plaintiffs and intervenor plaintiff, Yakama Indian Nation, have stated in their complaints that the doctrine of tribal sovereignty, standing alone, provides them with a source of equitable relief from the conduct of defendants. Defendants assert that tribal sovereignty does not supply plaintiffs with such an independent claim; therefore, they assert that they are entitled, as a matter of law, to summary judgment dismissing any claims by plaintiffs which are predicated solely upon this doctrine.

### a. Tribal Sovereignty Does Not Provide an Independent Source of Equitable Relief to the Plaintiffs.

■ Although there is no doubt that the Indian tribes retain "attributes of sovereignty over both their members and their territory," *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1979); *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978), the notion of tribal sovereignty as a bar to state jurisdiction has undergone a considerable evolution in recent history:

> The trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption.... *The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power* (emphasis added).

*McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1972). The doctrine of tribal sovereignty has emerged as a "backdrop" against which all applicable treaties and statutes must be read. *Id.* at 173, 93 S.Ct. at 1263.

Defendants correctly emphasize that the licensing and permitting fees at issue in this case have been directed at the activity of plaintiffs' trucks off-reservation. *See* Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Tribal Sovereignty Claims (*Wheeler* Ct.Rec. 63 at 7). Caselaw clearly establishes that tribal sovereignty, standing alone, does not preclude state jurisdiction over Indian conduct off-reservation. While Indian reservation lands and Indian income from on-reservation activities are generally not subject to the intrusion of state taxing authority, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1972); *White Mountain*, 448 U.S. at 144 n. 11, 100 S.Ct. at 2584 n. 11. *See e.g. Organized Village of Kake v. Egan*, 369 U.S. 60, 75–76, 82 S.Ct. 562, 570–71, 7 L.Ed.2d 573 (1961) ("[S]tate regulation of off-reservation fishing certainly does not impinge on treaty-protected reservation self-government.")

Plaintiffs admit, as they must, the general rule established in these cases; however, plaintiffs argue that the instant case is distinguishable:

> Defendants go on to cite several cases for the proposition that states have jurisdiction over the conduct of Indians off the

reservation. That is only the general rule, however, in the absence of an *express Treaty clause* to the contrary.... Regarding certain other cases cited by defendants implying that Tribal sovereignty ceases at the reservation boundary, *none of those cases involved treaties reserving rights outside the reservation as is the case here* (emphasis added).

While this distinction may provide for an exemption from taxation, plaintiffs are forced to concede that this exemption would result from the language of the Treaty, rather than from some attribute of tribal sovereignty. Cases such as *Gila River Indian Community v. Waddell*, 967 F.2d 1404 (9th Cir.1992), which plaintiffs rely upon to support an independent claim based upon tribal sovereignty, address the attempted exercise of state taxing authority *on* tribal reservations. *Id.* at 1413. Such cases cannot support plaintiffs' contention that the doctrine of tribal sovereignty precludes the state from imposing its taxing authority on Yakama activity off-reservation.

### b. Conclusion

This motion properly serves to narrow the issues before the court in this action by focusing on what must be the source of the right claimed by the Yakama Indian Nation. If the Yakama Indian Nation is to find relief from the sovereign state's clearly defined ability to tax, it must look to the Treaty with the Yakamas. Consequently, the court grants defendants' motion for summary judgment dismissing independent tribal sovereignty claims. Since the court finds that no independent claim based on tribal sovereignty is available in this case, the court need not address defendants' other arguments.

### D. Plaintiffs' Motion for Summary Judgment Regarding "In Common With" and Defendants' Motion for Summary Judgment Dismissing Treaty Claims

 Currently before the court are both the defendants' and plaintiffs' motions for summary judgment regarding the meaning of Article III. The court heard oral argument from the parties regarding these motions on November 10, 1994. In their briefs as well as oral argument, defendants assert that

there is no genuine issue of fact regarding the intent of the Yakamas at the time of the Treaty signing; therefore, they are entitled to judgment as a matter of law. The plaintiffs contend, however, in their own motion for summary judgment (which is essentially a cross-motion), that the meaning of "in common with," the pertinent phrase of the Treaty, has been defined by prior decisions. Thus, they claim that the meaning of the Treaty is unambiguous, and they are consequently entitled to declaratory judgment as a matter of law.

Defendants counter the plaintiffs' motion by arguing that Treaty fishing and travel rights are distinguishable. Therefore, the decisions relied upon by plaintiffs are inapposite to the issue in the instant case. Plaintiffs counter defendants' motion by claiming that if the court should agree with defendants that the prior decisions are not applicable to the current issue, then there is certainly a genuine issue of material fact as to the signatories' intent that requires adjudication at trial.

Although these two motions are basically cross-motions as to the construction of the Treaty, they present two distinct options to the court. Plaintiffs' motion is based entirely upon the legal conclusion that the prior decisions regarding fishing rights under the Treaty apply and determine the meaning of the right to travel in this case. Such an argument makes the majority of the factual evidence presented by both parties immaterial. This option does not require the court to conduct an extensive examination into the intent of the signatories in 1855. It instead requires the court to find that the right to fish and the right to travel can be treated analogously.

Defendants, of course, strenuously argue that these prior decisions construe a markedly different right under the Treaty. They stress that the right to travel and the right to fish cannot be considered analogous. As a result, the option presented in defendants' motion invites a determination of the signatories' intent. Naturally, this makes their motion a factually driven argument wherein defendants present evidence suggesting that

the Yakamas intended or understood that they would only have the same rights to travel as non-Indian citizens. Defendants state that such a right, to share the public highways "in common with" other citizens, requires the Yakamas to take the bitter with the sweet: to share in the taxation which provides and maintains those highways.

Even if the court should accept defendants' invitation to analyze all of the circumstances which could justify a different interpretation for this Treaty language in the context of travel, that endeavor might very likely lead the court to conclude that both defendants' and plaintiffs' constructions of the Treaty are equally plausible. In that event, the canons of construction applying to Indian treaties would require the court to adopt the interpretation favoring the Yakamas. However, in apparent recognition of that tenet, defendants point to evidence which they claim establishes the meaning of this Treaty provision unambiguously.

These cross motions constitute the crux of this litigation, and determination of them by the court should dispose of the case. The court is persuaded for reasons that follow that it cannot construe the "in common with" language as it applies to Treaty travel rights any differently than this phrase has been construed regarding the Treaty right to fish. Inherent in that holding is this court's view that it is bound by the prior decisions on this issue and that defendants have not identified any material grounds precluding their application in this case.

### 1. Facts Material To Plaintiffs' Motion

The following material facts are taken from the statements submitted by the parties pursuant to LR 56.[12] (Ct.Recs. 103, 164, 146, *Wheeler* Ct.Rec. 118). With regard to plaintiffs' motion for summary judgment regarding the meaning of "in common with," there are no disputes of material fact. Thus, the sole question for the court is whether the

plaintiffs are entitled to judgment as a matter of law.

Article III of the Treaty with the Yakamas, signed in 1855, provides in its entirety:

*And provided,* That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with the citizens of the United States, to travel upon all public highways.

The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

Washington State law has required that motor vehicles be registered with an accompanying registration fee since 1905. Vehicles owned by individual Indians have never been exempt from Washington State vehicle registration fees. Washington has further required trucks to be licensed according to gross weight, with higher weights bearing higher licensing fees since 1915, and trucks owned by individual Indians have never been exempt from such license fees. In addition, Washington has required log tolerance permits for certain overweight trucks, with an accompanying fee, since 1953. Again, individual Indians have never been exempt from such fees. Fees paid to the State of Washington for truck licenses and log tolerance permits are credited to the state motor fund and used exclusively for highway purposes.

Even prior to the signing of the 1855 Treaty, the Yakamas traveled extensively.[13] This

---

12. Both the plaintiffs and defendants have submitted separate statements of material fact for these two summary judgment motions. Since the matters at hand are essentially cross-motions for summary judgment, the court will refer to all

submitted statements of fact as it deems necessary in rendering its decision.

13. Although defendants have contested the admissibility of some of plaintiffs' submitted facts, *see* Reply Memorandum in Support of Defen-

far-reaching travel was an intrinsic ingredient in Yakama culture, and it was of the utmost importance to the Yakamas.[14] The Yakamas possessed a large horse herd which enabled them to travel in order to hunt, fish, and engage in other commerce. They traveled Washington State's public roads and highways without charge until the state began enacting statutes which imposed licensing and permitting fees.

## 2. Analysis of Parties' Arguments Regarding Plaintiffs' Motion

The plaintiffs' position is founded on the fact that both the fishing right and travel right are located in the same Article of the Treaty and contain the same "in common with" language. Based on this identical language and proximity in the Treaty, plaintiffs argue that prior decisions regarding the Treaty fishing right which have already established a favorable definition of "in common with," apply and consequently entitle them to judgment as a matter of law. Defendants oppose this argument by noting that all prior decisions regarding Article III interpreted the extent of fishing rights. No prior decisions have interpreted the right to travel provision in Article III. Defendants assert that the prior decisions are therefore inapposite and should not be relied upon by the court in determining the meaning of the travel right.

### a. Licensing and Permitting Fees Cannot Be Imposed on the Article III Travel Right

In *Tulee v. Washington*, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1941), appellant contended that the Washington statute which compelled him to obtain a license in order to fish for salmon violated the Treaty fishing right denoted in Article III. *Id.* at 683, 62 S.Ct. at 863–64. In determining how to construe the Treaty fishing right, the Supreme Court looked to such prior decisions involving the language of Article III, to the record which indicated that the right to hunt and fish was extremely important to the Indians, and to the canons requiring liberal construction of Treaty provisions in favor of the Indians. *Id.* at 684–85, 62 S.Ct. at 864–65. Using this methodology, the Court concluded:

> [W]hile the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing *outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging a fee of the kind in question here....* The license fees prescribed are regulatory as well as revenue producing. But it is clear that their regulatory purpose could be accomplished otherwise, that the imposition of license fees is not indispensable to the effectiveness of a state conservation program. Even though this method may be both convenient and, in its general impact, fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve.

*Id.* Thus, although the Court recognized that it was dealing with a nonexclusive right to fish in *Tulee*, it still held that the imposition of licensing fees was an impermissible interference with the right provided to the Yakama Indian Nation by the Treaty.

---

dants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 169), defendants do not dispute most of the historical facts asserted in the plaintiffs' memorandum, submitted in support of their summary judgment. In fact, defendants concede in their own brief that the Yakamas were a well traveled people. *See* Defendants' Opposition to Wheeler Logging's Motion for Partial Summary Judgment Re Meaning of "In Common With" (*Wheeler* Ct.Rec. 119 at 14). Thus, there is no dispute as to this particular material fact.

**14.** *See* Declaration of William Yallup attached to Plaintiffs' Local Rule 56 Statement of Material

Facts Regarding the Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 164). Although defendants challenge the admissibility of much of Mr. Yallup's declaration for purposes of summary judgment consideration, the defendants have not challenged Mr. Yallup's statements regarding the Yakamas' proclivity for travel. Since Mr. Yallup certifies that he makes these statements based on his personal knowledge, and since his credentials reflect he is competent to testify to this matter, the court may rely on his statements regarding the history and extent of Yakama travel.

Plaintiffs rely heavily upon *Tulee*, because it most closely parallels the situation involved in this case. If the court determines that the travel right should be accorded the same status as the fishing right, then *Tulee* precludes the state from imposing its licensing and permitting fees upon the plaintiffs.

### i. Defendants Fail to Distinguish *Tulee*

Defendants have attempted to undercut the significance of *Tulee* by claiming that it does not stand for the proposition that the state may *never* impose licensing fees upon the Treaty right. As defendants point out, the Supreme Court stated that "the imposition of license fees is not indispensable to the effectiveness of a state conservation program." *Id.* Defendants contend that this language suggests that license fees which are allocated for preservation and maintenance purposes are permissible. Since the record shows that the revenue generated by these fee requirements goes into the highway fund in part to help maintain the highways, defendants claim that *Tulee* does not proscribe the fees at issue.

However, in its Order Re: Subject Matter Jurisdiction, Intervention (Ct.Rec. 133), this court noted that the fees at issue were predominantly revenue raising rather than regulatory. Moreover, it is clear in this case, as it was in *Tulee*, that the regulatory purpose of these statutes, to discourage overweight travel on the highways, can be accomplished without the imposition of these fees. Indeed, plaintiffs have already conceded that they will remain subject to the weight regulations imposed by the state which are designed to preserve the condition of the highways. Further, there is nothing in the record that suggests that these fees are *"indispensable"* to the preservation of the highways. The fees are not regulatory in themselves; rather they merely provide a source of revenue which the state *chooses* through its legislative enactments to devote a portion of towards the highway fund. The state could potentially obtain the revenue needed to build and maintain highways from different taxes.

### ii. The Fishing and Travel Rights are Analogous

One of the arguments propounded by defendants in response to *Tulee* is that the fishing right and travel right are distinguishable. *See* Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 102 at 17–18). Defendants point out that in *Tulee* the Supreme Court identified the right to fish as one which the Yakamas "reserved" by Treaty, whereas the Treaty minutes identify the roads as a "future" development. (Ct.Rec. 102 at 18).[15] Defendants assert that since the Treaty right involved roads which were "to be built," rather than in existence at the time of the signing of the Treaty, travel was a "granted" right not a "reserved" right; therefore, the reasoning of *Tulee* is inapplicable.

The defendants' distinction between the Treaty right to travel and the right to take fish ignores the history illustrating the importance of travel to the Yakamas. As the record reflects, and defendants themselves admit, the Yakamas traveled extensively, their trips taking them, for example, to Willamette Valley and Nisqually. *See* Defendants' Opposition to Wheeler Logging's Motion for Partial Summary Judgment Re Meaning of "In Common With" (*Wheeler* Ct. Rec. 119 at 14 n. 5). Their ability to travel provided them with the means to exercise their aboriginal practices of hunting, fishing, and trading. *See* Declaration of William

---

**15.** The passage of the treaty minutes referred to by the defendants reads as follows:

My brother has stated that you will be permitted to travel the roads outside the Reservation. We have some kind of road which perhaps you have never seen; *we may wish to make* one of the roads from the settlements east of the mountains to our settlements here; they *may* desire to run that road through your Reservation; if we desire to do so we wish that privilege; that kind of road we call a railroad.... Now if our chief desires to construct such a road through your country we want you to agree that he shall have the privilege. You would have the benefit of it as well as other people.

Now as we give you the privilege of traveling over roads, we want the privilege of making and traveling roads through your country, but whatever road *we make* through your country will not be for your injury (emphasis added).

Yallup, attached to Plaintiffs' Local Rule 56 Statement of Material Facts Regarding the Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 164); *see also, United States v. Washington,* 384 F.Supp. 312, 380 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (Judge Boldt described the Yakamas as a "food gathering culture" which existed on such resources as game and fish and which traveled extensively not only to fish for their own consumption but also to communicate and trade with other tribes located as far as Puget Sound.) Indeed, Judge Boldt, in his lengthy findings of fact, stated:

> At the treaty negotiations, a primary concern of the Indians whose way of life was so heavily dependent upon harvesting anadromous fish, was that they have *freedom to move about to gather food,* particularly salmon ... at their usual and accustomed places (emphasis added).

*Id.* at 355. The record in this case and Boldt's prior inquiry clearly show that the Yakamas were concerned at the Treaty negotiations with "reserving" the right to travel to those sites where they gathered food and traded, whether they did so by the trails they had been using or by the roads which were "to be built" in the future by the white settlers. Thus, the court finds that the right to travel was, just like the right to take fish, a "reserved" right.

In support of this finding, the court further notes that the Treaty itself does not use the term, "reserved." Rather, the term, "secured to," is used to describe *both* the right to fish and the right to travel. The meaning of this term would seem to constitute a guarantee of something already possessed.

Also, the record and Boldt's decision further illustrate that the right to travel and the right to take fish are inextricably intertwined. The right to fish obviously depended upon the ability of the Yakamas to travel to various sites. Thus, if the right to take fish was so important to the Yakamas, *see e.g. Tulee,* 315 U.S. at 684, 62 S.Ct. at 864, then clearly the preservation of their right to travel to those sites upon the future roads to be built by the white settlers was equally important.[16] This is supported by the Treaty minutes, which show that the Indians were made fully aware of the future construction of the public roads, both on and off their reservation. Through the public highways clause, the Yakamas preserved their aboriginal right not only to continue traveling off-reservation to obtain their means of subsistence, but to do so on those public highways if and when they should be built.

The interrelation of the rights to fish and travel is further supported by the text of the Treaty itself. The court finds great significance in the fact that both of these rights are addressed in the same Article of the Treaty. This proximity indicates that these rights were likely considered by the signatories to be intertwined and of equal importance. Defendants' argument, that these two rights which are addressed by almost identical language in the same Article should be given remarkably different interpretations, is simply unconvincing.

### iii. A Treaty Can Reserve Rights which Extend to Future Technological Developments

 Defendants' suggestion that the Yakamas could not have reserved any right "to

---

**16.** The defendants argue against this analogy by claiming that the "right of access" language in the fishing clause of the treaty was what gave the Yakamas the right to travel to the fishing sites, not the "public highways" clause. *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 169 at 10–11). They cite *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1978) as support for this position. However, the discussion of the right of access in *Fishing Vessel* reveals that this was not the focus of the Supreme Court's decision. Rather, the Court considered the access language in connection with "in common with" to determine whether the treaty gave the Indians merely an opportunity to catch fish along with non-Indians or whether it gave them more than simply this equal opportunity. The Court concluded: *"It is equally plausible that the specific provision for access was intended to secure a greater right—a right to harvest a share of the runs of anadromous fish...." Id.* at 675, 99 S.Ct. at 3069. Even accepting defendants' argument, the public highways clause can still be viewed as reserving the Yakamas' vital aboriginal right to travel extensively upon the *future* roads to be built by the settlers.

drive trucks on state highways" because these highways were a future development is unfounded. *See* Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 102 at 18). Prior decisions recognize that treaty rights can persist despite technological developments not in existence at the time of the treaty signing:

> New conditions came into existence, to which those rights [fishing] had to be accommodated. Only a limitation, however, was necessary and intended, not a taking away.... The respondents urge an argument based upon the different capacities of white men and Indians to devise and make use of instrumentalities to enjoy the common right ... *It needs no argument to show that the superiority of a combined harvester over the ancient sickle neither increased or decreased rights to the use of land held in common* (emphasis added).

*United States v. Winans,* 198 U.S. 371, 381–82, 25 S.Ct. 662, 664–65, 49 L.Ed. 1089 (1905). The extension of reserved treaty rights to future technological developments was addressed directly by Judge Boldt in his decision:

> The Stevens' treaties do not reserve to the Treaty Tribes any specific manner, method or purpose of taking fish; nor do the treaties prohibit any specific manner, method or purpose. *Just as non-Indians may continue to take advantage of improvements in fishing techniques, the Treaty Tribes may, in exercising their right to take anadromous fish, utilize improvements in traditional fishing methods,* such for example as nylon nets and steel hooks (emphasis added).

*United States v. Washington,* 384 F.Supp. at 407. This decision shows that a reserved treaty right may extend to developments not even contemplated by the Indians at the time of treaty signing. Certainly then a treaty right can be reserved for a technological development which was expressly contemplated by the parties to the Treaty: the building of roads. Thus, the mere fact that the roads were to be a future development, does not preclude the Yakamas from *reserving* the right to travel upon them. Like their right to take fish, the Yakamas reserved the right to travel, albeit on roads to be constructed in the future, in the same fashion as they had prior to the signing of the treaty.

### iv. The Fishing Rights Cases Do Construe "In Common With"

■ Plaintiffs argue that the fishing cases have given the "in common with the citizens" language of Article III a well established legal meaning; one that entitles the Tribe to rights beyond those of ordinary citizens. They conclude that, since the right to travel upon the public highways contains this identical language, the court should apply the same favorable construction given to this phrase in those prior decisions.

Defendants challenge the plaintiffs' assessment of those cases by claiming that none of the decisions addressing the Article III fishing right actually construe that particular phrase, but actually have based their decisions on other contextual factors. The defendants' claim is flatly contradicted by Judge Boldt's conclusion: "There is no indication that the Indians intended or understood the language 'in common with the citizens of the Territory' to limit their right to fish in any way." *United States v. Washington,* 384 F.Supp. at 333. It is clear that in the prior decisions, any review of contextual factors was undertaken simply to ascertain the meaning of "in common with," that is, to determine exactly what the nonexclusive right provided in Article III actually entails. In other words, the examination of context was the means whereby "in common with" was defined.

For example, defendants claim that in *Tulee v. Washington,* 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), the Supreme Court relied "on the circumstances surrounding the negotiation of the Yakama Treaty and the Indians' desire, which the Court inferred from the minutes of the Treaty council, to continue fishing 'in accordance with the immemorial customs of their tribes.'" *See* (*Wheeler* Ct.Rec. 119 at 5). However, in making such an argument, defendants overlook the express language of the Court:

> "despite the phrase '*in common with* citizens of the Territory,' Article III conferred

upon the Yakimas continuing rights, *beyond those which other citizens may enjoy,* to fish at their 'usual and accustomed places' ..." (emphasis added). *Tulee,* 315 U.S. at 684, 62 S.Ct. at 864, *citing, United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). Thus, the Court examined the factors noted by defendants; however, it used these considerations to arrive at its conclusion that this nonexclusive right held by the Indians "in common with" non-Indians gives *more* than simply those same rights enjoyed by non-Indians.

Defendants similarly claim that the Court did not construe "in common with" in *Winans.* However, defendants again ignore the express language of that decision:

> The pivot of the controversy is the construction of the second paragraph. Respondents contend that the words *"in common* with the citizens of the Territory" confer only such rights as a white man would have....

*Winans,* 198 U.S. at 379, 25 S.Ct. at 663. In addressing this contention, the Court went on to state:

> The contention of the respondents was sustained [in a prior decision]. In other words, it was decided that the Indians acquired no rights but what any inhabitant of the Territory or State would have. Indeed, acquired no rights but such as they would have without the treaty. This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more.

*Id.* at 380, 25 S.Ct. at 664. Thus, upon consideration of the factors emphasized by the defendants, the Court again construed

"in common with" as providing additional rights beyond those enjoyed by non-Indians.[17] *See also Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 679, 99 S.Ct. 3055, 3071, 61 L.Ed.2d 823 (1979) (holding that the right to take fish "in common with non-Indian citizens" gave the Indians a right to a class share of fish, not just an "equal opportunity" to catch fish on the same grounds as non-Indians); *Puyallup Tribe v. Dept. of Game,* 391 U.S. 392, 397, 88 S.Ct. 1725, 7252, 20 L.Ed.2d 689 (1967).

On at least five separate occasions, the Supreme Court has previously been urged to adopt a strict literal interpretation of "in common with" in the fishing cases, and each time, it has refused to do so. Instead, the Court has taken pains to state that "despite" this phrase, which on its face does permit the inference that the Indians were to have only those same rights enjoyed by non-Indians, the Treaty has given the Indians rights beyond this boundary. *See Tulee,* 315 U.S. at 684, 62 S.Ct. at 864. Defendants would have this court undertake a lengthy factual inquiry into the intent and understanding of the Yakamas at the time of the treaty signing to determine the meaning of a phrase which has, on every occasion, been defined by the Supreme Court in a manner inimical to their claim.

The fact that such an endeavor would be unnecessarily repetitious is even more apparent when considered in light of Judge Boldt's finding:

> The treaty language "in common with all citizens of the Territory was probably introduced by George Gibbs, who was a lawyer and advisor to Governor Stevens.

---

17. Defendants assert: "Without the Treaty, the Yakamas could legally have been excluded from public highways. The Treaty guaranteed them a right many Indians lacked: a right to leave the reservation and use the highways as citizens did." Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 102 at 8). The court fails to see the relevance of this argument; the Yakamas did expressly retain the right to travel these future public highways in the Treaty. Moreover, defendants are viewing the Treaty from a flawed perspective. Without the Treaty, the Yakamas would not have ceded all their "right, title, and interest in and to the lands and country occupied and claimed by them" to the United States. *See Treaty with the Yakamas,* Article I. Defendants overlook the fact that it was this initial cession by the Yakamas of vast parcels of their land that facilitated the construction of the public highways. Ultimately, however, defendants' conclusory statement simply ignores the plain language of the Treaty. The Treaty did not reserve the right "to leave the reservations and use the highways as the citizens did," but rather a right to use them "in common with the citizens." It is for the court to determine the extent of the right modified by such language.

There is no discussion of the phrase in the minutes of the treaty councils, in the instructions to Stevens, or to the treaty negotiators, or in Stevens' letters of transmittal of the treaties. *There appears to be no phrase in the Chinook jargon that would interpret the term in any exact legal sense* (emphasis added).

If this observation indicates that the Yakamas had at best a rudimentary understanding of the "in common with" phrase, then it is difficult to imagine a sophistication on their part that would distinguish between an application of that term to the fishing context as contrasted with the travel context. If that is the case, then the court is entitled to apply the already defined meaning of that phrase to the travel provision.

Were the court convinced that the fishing and travel rights were not comparable, then such an inquiry into the Yakamas' intent might be justified. However, since these two rights appear to be analogous, the court is entitled to rely upon the construction given to "in common with" by the fishing cases in its interpretation of the Treaty right to travel on the public highways. Consequently, the court finds that, as in *Tulee v. Washington,* the state may not impose licensing or permitting fees upon the Yakama Indian Nation's right to travel upon the public highways.

### v. Reading the Treaty Right to Travel in Context Does Not Necessitate a Factual Inquiry into the Signatories' Intent

█ Throughout their briefs, defendants strive to impress upon the court the need to read the Treaty right to travel upon the public highways in the context of the remainder of the Treaty language, the Treaty's historical context, and the conduct of the Yakamas since the Treaty was signed. *See* Defendants' Opposition to Wheeler Logging's Motion for Partial Summary Judgment Re

Meaning of "In Common With" (*Wheeler* Ct. Rec. 119 at 4). However, the court need not undertake such an endeavor if it determines that the prior decisions, in their examination of such factors, have already provided an interpretation of identical language surrounding a similar right, which can be applied to the present situation. Read in context of these prior decisions, the extent of the Treaty right to travel the public highways is made unambiguous.[18]

In construing "in common with," the court is certainly entitled to look to the prior decisions construing such language. Indeed, those cases themselves reflect such a methodology. *See e.g. Tulee,* 315 U.S. at 684, 62 S.Ct. at 864 (besides looking to the record and the proceedings surrounding the Treaty council, the Court looked to the construction of "in common with" given in *Winans* ). Defendants are correct in pointing out that in those prior fishing cases, the courts have weighed a variety of contextual factors. Since this phrase has been defined it is unnecessary to repeat the examination of these contextual factors. The prior decisions have already reached a conclusion as to the meaning of "in common with" which delineates a result that contravenes defendants' position in this case.

The interpretation of treaty provisions is a matter of law within the domain of the court. *See Sioux Tribe v. United States,* 500 F.2d 458, 462, 205 Ct.Cl. 148 (1974); *United States ex rel. Chunie v. Ringrose,* 788 F.2d 638, 643 n. 2 (9th Cir.1986), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *Cayuga Indian Nation of New York v. Cuomo,* 758 F.Supp. 107 (N.D.N.Y.1991). Thus, where the court determines that questions of the Yakamas' understanding and intent have already been resolved regarding a closely analogous right, the court need not conduct its own such inquiry. *See Sokaogon Chippewa Community v. Exxon Corp.,* 805 F.Supp.

---

**18.** Defendants note that the Ninth Circuit has stated that the Yakama Treaty Clause at issue "is somewhat ambiguous in securing the plaintiffs" the right they claim. *Cree v. Washington,* No. 91–35882, slip op. at 3, 1993 WL 115230 (9th Cir. Apr. 14, 1993). However, this does not preclude the court from determining that the right to travel upon public highways is unambig-

uous, when considered in conjunction with the prior fishing rights decisions. As defendants themselves admit, the Ninth Circuit's statement "is not the same as saying the Treaty is ambiguous." *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 169 at 9).

680, 711 (E.D.Wis.1992), *aff'd,* 2 F.3d 219 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1304, 127 L.Ed.2d 655 (1994) ("[T]he interpretation of Indian treaties is a question of law and thus amenable to summary judgment").

Although they protest plaintiffs' attempts to persuade the court to apply the construction of "in common with" in the fishing decisions, defendants themselves have urged this court to adopt the construction of similar Treaty language provided in prior cases. In their memorandum, defendants claim that various cases have already defined the "free access" language simply as a personal right of movement. *See* Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 102 at 9–10). They suggest that these cases show that the plain language unambiguously gave the Yakama Indian Nation only the same rights of travel as enjoyed by non-Indian citizens: merely the right of physical access. However, the cases cited by defendants do not construe the "in common with" language of the Treaty, nor do they address the right of travel as it pertains to this particular Treaty. As a result, the fishing rights cases which construe this identical language as it pertains to this particular Treaty with the Yakamas are more compelling.

### vi. The Yakamas' Understanding of "Public Highways" Need Not Be Addressed for Purposes of This Motion

Defendants emphasize in their briefs that the meaning of "in common with" as it pertains to the Article III right to travel public highways necessarily requires the court to ascertain what the Yakamas' understanding of "public highways" was at the time of the treaty signing. *See* Defendants' Opposition to Wheeler Logging's Motion for Partial

Summary Judgment Re Meaning of "In Common With" (*Wheeler* Ct.Rec. 119 at 6). However, defendants' assertion is only valid if the court should find that the Article III rights to travel the public highways and the right to take fish are incongruent. Defendants correctly note that the two rights are not identical;[19] however, this does not preclude the court from applying the prior fishing rights decisions if it finds that the right to travel is sufficiently comparable to the right to take fish. Since the right to travel the prospective public highways has been deemed to be a "reserved" right which was of the utmost importance to the Yakamas, the court can apply the prior interpretations of "in common with" to the present situation without conducting the factual inquiry into the Yakamas' understanding and intent at the time the treaty was formed.

### vii. The Court's Interpretation of The Treaty Right to Travel Upon Public Highways is in Harmony with the Rule Prescribing Liberal Construction of Indian Treaties

■ The canons of construction provide that the language in treaties is to be construed as the Indians would naturally have understood such terms, with doubtful or ambiguous expressions resolved in the Indians' favor. *See United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 663–64, 49 L.Ed. 1089 (1905); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 676, 99 S.Ct. 3055, 3069–70, 61 L.Ed.2d 823 (1979); *Tulee v. Washington,* 315 U.S. 681, 684–85, 62 S.Ct. 862, 864–65, 86 L.Ed. 1115 (1942). Such rule has led to a broad rule of liberal construction of Indian treaties, a rule which the Supreme Court has relied upon in construing the terminology of Article III. *Commercial Fishing,* 443 U.S. at 676, 99 S.Ct. at 3069–70

**19.** At one point, defendants suggest that if the plaintiffs did, in fact, "reserve" the right to travel in the manner that they had been accustomed then they must have the burden to prove that a particular road was previously a traditional route before the right under the treaty can attach. *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Treaty Claims (Ct.Rec. 169 at 11). However, defendants then retract this position: "None of that matters, though, because the right in question is not a reserved 'right to travel *in usual and accustomed places* (emphasis added).'" (Ct.Rec. 169 at 11). Defendants are correct in noting that the fishing right reserved under this treaty has this limitation, whereas the right to travel does not. Thus, plaintiffs need not prove that the public roads were traditional routes in order to exercise their treaty right.

("This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor").

The court's application of the interpretation given to "in common with" in the fishing cases to the Article III travel right at issue in this case is appropriate, especially in light of the emphasis placed on liberal construction in favor of the Indians. Defendants' argument, that the same phrase in the same paragraph may yet be accorded a different meaning when it applies to travel upon public highways, is the type of "technical" construction that the Supreme Court has avoided in these cases. *See id.*

### viii. *Moe v. Confederated Salish & Kootenai Tribes* Does Not Foreclose Plaintiffs' Interpretation of the Article III Travel Provision

Defendants charge that *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), forecloses the Yakamas from their claim that "in common with" allows them to travel upon public highways exempt from taxation. *See* Defendants' Opposition to Wheeler Logging's Motion for Summary Judgment Re Meaning of "In Common With" (*Wheeler* Ct.Rec. 119 at 12). However, while the treaty signed by the Indians in that case contained a provision identical to the one in the Yakama Treaty, that provision was not the subject of litigation.[20] The Tribe involved in that case expressly disclaimed any immunity from the nondiscriminatory vehicle registration fee imposed by the State of Montana. *Id.* at 469 n. 9, 96 S.Ct. at 1638 n. 2, *aff'g* 392 F.Supp. 1325, 1326 (D.Mont.1975). The defendants' attempt to suggest that the meaning of the Article III travel provision was somehow de-

termined or adjudicated in that case constitutes a misreading of it.[21]

### b. Conclusion

The uncontested facts in the record as well as prior decisions show that the right to travel was an extremely important element of Yakama culture. Their travels facilitated the fishing, hunting and trade necessary to their survival. The right to travel upon public highways was, therefore, a right that the Yakamas reserved in Article III of the Treaty. The similarities between the right to travel upon public highways and the right to fish permit application of the prior fishing rights decisions to this case. These prior fishing decisions define the meaning of "in common with" unambiguously as giving the Indians more than simply those rights enjoyed by non–Indian citizens; it gives the Yakama Indian Nation the right to exercise its nonexclusive rights without being subject to licensing or permitting fees. Thus, the court finds that, as a matter of law, the phrase "in common with," precludes the State of Washington from imposing licensing or permitting fees upon the Yakama Indian Nation's exercise of its Article III right to travel upon the public highways. However, as plaintiffs have conceded, the right to travel will be subject to regulations designed to protect and conserve the highways.

By granting plaintiffs' motion for summary judgment regarding the meaning of "in common with," the court must consequently deny defendants' motion for summary judgment dismissing the Treaty claims. In construing the right to travel based on the prior decisions, the court forecloses the factual inquiry into the signatories' intent, which provides the basis for defendants' motion.

**20.** In their brief, defendants make a significant misstatement. They claim that the Supreme Court said "a fee required for registration and issuance of state license plates for a motor vehicle could be exacted from Indians residing on the [Flathead] reservation." (*Wheeler* Ct.Rec. 119 at 12). That is inaccurate. The Court was only reiterating what the *District Court* involved in that case had determined. Since the Tribe in that case never contested Montana's ability to

impose this registration fee, the Court did not speak to this issue in its decision.

**21.** Defendants also claim that *County of Yakima v. Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) collaterally estops plaintiffs from raising the issue in the instant case. The court has already determined that *County of Yakima* had nothing to do with the issue of treaty interpretation presently contested.

**E. Defendants' Motion for Summary Judgment Dismissing the Claims of Douglas Beebe**

Defendants have additionally moved for partial summary judgment to dismiss all of the claims of individual plaintiff Douglas Beebe. (Ct.Rec. 61). Unlike the other individual plaintiffs named in *Cree*, Beebe is a member of the Makah, rather than the Yakama Tribe. He is a truck driver for Tiin–Ma Logging Company, which is owned by plaintiff Richard Ramsey, who is an enrolled Yakama Indian. He became a plaintiff in this lawsuit after receiving citations from the Washington State Patrol for violating truck licensing laws while driving one of Tiin–Ma's logging trucks. Defendants have moved for summary judgment on the grounds that, since Beebe is not a Yakama, he has no rights under which he can state a claim.

Plaintiff, Douglas Beebe, as one of the individual plaintiffs of *Cree v. Waterbury*, C–89–458–AAM, claims that the defendants have interfered with rights secured to him through the Treaty with the Yakamas and federal law by citing him on various occasions for violations of Washington licensing requirements. Beebe's claim appears to have primarily two prongs: 1) a claim based on defendants' violation of the Yakama Treaty; 2) a claim based on 42 U.S.C. § 1983 for violation of his constitutional right "to be gainfully employed." *See* Complaint for Damages, Injunction, and Declaration of Rights (Ct.Rec. 1 at 11).

Defendants filed a motion of summary judgment dismissing with prejudice all claims of Douglas Beebe on October 28, 1992. (Ct. Rec. 61). However, on March 16, 1993, the court stayed the resolution of this motion pending resolution of defendants' appeal of their first motion for summary judgment. (Ct.Rec. 71). The Ninth Circuit having decided defendants' appeal, (Ct.Rec. 80), this motion comes before the court pursuant to its revised scheduling order. (Ct.Rec. 132). All parties have submitted briefing on this

motion, and it is therefore ripe for decision by this court.

**1. Facts Material to Defendants' Motion Regarding Douglas Beebe**

The following facts are excerpted from those submissions accompanying the parties' briefs.[22] There are no disputes of material fact pertaining to this motion.

Plaintiff Beebe is a member of the Makah Indian Tribe, not the Yakama Indian Nation. The Makah Treaty does not contain a travel clause like the one in Article III of the Yakama Treaty. Beebe works for plaintiff Richard "Kip" Ramsey, the owner of Tiin–Ma Logging Company. Ramsey is an enrolled member of the Yakama Indian Nation. The Yakama Indian Nation has no ownership interest in Tiin–Ma.

Beebe has received several citations (RCW §§ 46.16.135, 46.16.145), while driving a Tiin–Ma Logging Company truck on a state highway, for his failure to comply with the overweight licensing requirements set forth in RCW §§ 46.16.070, 46.16.140.

Ramsey states that as a Yakama Reservation employer, he is bound by the terms of the Tribal Employment Rights Ordinance (TERO). This ordinance requires Ramsey to hire 85% local Indian labor; however, TERO allows him to include non–Yakama Tribal members in his work force, such as Beebe. Ramsey states that if Beebe cannot enjoy the protection of the Yakama Treaty, then Ramsey will be unable to employ him.

TERO provides certain protections to those Indians to whom it applies. TERO compliance plans must be filed for each timber contract. These plans set percentage quotas for the Indian portion of the workforce. The compliance plans also require the employer to maintain certain employee information including any terminations, along with the date and written justification. The compliance plans also require the employer to give preferential consideration for promotions to local Indian employees. TERO is consistent with federal law and has been

---

**22.** Defendants have submitted a Local Rule 56 Statement of Material Fact; however, plaintiffs have only provided an affidavit as well as a copy of the Yakama Indian Nation's Tribal Employment Rights Ordinance (TERO).

endorsed by the United States Congress based on the grounds that it is consistent with the Federal Government's policy of encouraging Indian employment and with the special legal position of Indians.

## 2. Analysis of Parties' Arguments

The defendants contend that since Beebe is not a Yakama, he cannot assert any rights under the Treaty. They also argue that any rights under the Treaty are communal in nature and therefore not delegable to Beebe in his individual capacity. Finally, the defendants assert that Beebe cannot identify any rights which would give him a claim under 42 U.S.C. § 1983. As a result, defendants claim that they are entitled, as a matter of law, to summary judgment dismissing all of Douglas Beebe's claims in his individual capacity.

Beebe argues in response that the Yakamas can choose to exercise their Article III Treaty right through the use of non-members. (Ct.Rec. 92 at 5). Thus, he asserts that he is entitled to the protection of the Treaty while engaged in the assistance of this right. (Ct.Rec. 92 at 7).[23]

In the alternative, Beebe asserts that he has cognizable civil rights claims under 42 U.S.C. § 1983. He claims, first, that the Yakama Treaty gives him a valid protectable right as an "assistant" upon which the defendants have impermissibly infringed. (Ct. Rec. 92 at 7). He additionally claims that the actions of the defendants interfere with his protectable right to employment. (Ct. Rec. 92 at 8). From this, he asserts that he has a 42 U.S.C. § 1983 action against defendants for their deprivation of his Fourteenth Amendment due process rights. Finally, although he does not specifically refer to it in his response to defendants' motion, he also suggests in the complaint (Ct.Rec. 1) that he has an action under 42 U.S.C. § 1983 for defendants' violation of his Fourth Amendment rights.

For the reasons discussed more fully below, the court finds that as an individual

plaintiff, Beebe has no basis upon which he can state a claim in this case.

### a. Beebe Has No Rights Under the Treaty

Reserving for a moment the question of the extent of the Yakama Indian Nation's right, the court finds that no rights provided in the Treaty vest in the non-member agent or employee. The treaties signed with the Indians secured rights for the various signatory "tribes and bands of Indians." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 679, 99 S.Ct. 3055, 3071, 61 L.Ed.2d 823 (1979). As was recently stated by Judge Marsh:

> Rights, enumerated under treaties, are reserved to communities or "tribes" rather than to individuals. Because individuals have no enforceable off-reservation fishing rights, when and how an individual may use treaty rights is an "internal affair" of the tribe.

*United States v. Oregon*, 787 F.Supp. 1557, 1566 (D.Or.1992), *aff'd*, 29 F.3d 481, 484 (9th Cir.1994) ("As we explained in *Washington I*, '[e]ach tribe bargained as an entity for rights which were to be enjoyed communally'"). Moreover, defendants correctly note that these rights cannot be assigned or delegated to others. *See United States v. Washington*, 476 F.Supp. 1101, 1110 (W.D.Wash.1979), *aff'd*, 641 F.2d 1368 (9th Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). (In discussing the nature of fishing rights secured under the treaties of Medicine Creek and Point Elliot, the court noted: "Being communal in nature, these rights are not inheritable or assignable by the individual member to any person, party, or other entity of any kind whatsoever"). Therefore, Beebe cannot assert any rights under the Treaty either directly or inferentially. While the Treaty may indeed give the Yakama Indian Nation the autonomy to enact such measures as TERO to use non-members in the exercise of its travel right, the non-members do not somehow be-

---

**23.** Plaintiff Beebe recognizes that he does not have a *direct* right under the Yakama Treaty. Counsel, when questioned about Mr. Beebe's claim at oral argument, reaffirmed this point. However, he claims that he obtains this right "inferentially" since he operates a vehicle owned by a business operating under the Yakima Treaty. *See* (Ct.Rec. 92 at 6).

come a party to that Treaty. Beebe's attempt to exercise Treaty rights as a proxy clearly contradicts the law regarding the nature of such rights.[24]

Furthermore, the court dismissed all claims of individual plaintiffs which challenge the financial obligations under the truck licensing and permitting laws, except any challenges to the imposition of regulations per se. *See supra* note 5. Since both plaintiffs' counsel have conceded that plaintiffs are subject to the state's regulations designed for preservation of the highways, Beebe effectively has no claim remaining in this case, except any based solely upon his right to employment or on federal preemption. The court, therefore, considers plaintiff Beebe's claims only to the extent that they challenge defendants' interference with his right to be gainfully employed.

#### b. Beebe's Claims Under 42 U.S.C. § 1983 Fail As a Matter of Law

Along with his treaty based claim, Beebe alleges that he has several claims under 42 U.S.C. § 1983 for the defendants' deprivations of rights secured to him by the Treaty as well as the Constitution. However, none of these, as a matter of law, validly state a claim.

#### i. Beebe Has No Rights as "Assistant"

Beebe claims that through the issuance of citations, defendants have deprived him of his right to act as an "assistant" under the Yakama Treaty; therefore, he has an action under 42 U.S.C. § 1983. (Ct.Rec. 92 at 7). In determining whether § 1983 is available to remedy a statutory or constitutional violation involves a two step inquiry. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). The plaintiff must first assert the "violation of a federal right ... Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* In *Golden State*, the Su-

preme Court noted that "§ 1983 speaks in terms of 'rights, privileges, or immunities,' not violations of federal law." *Id.; citing, Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981). Since, as indicated above, the Treaty secures no rights to Beebe in his individual capacity, the Treaty cannot provide the source for his 42 U.S.C. § 1983 claim.

#### ii. Beebe Has No Claim for Violation of His Fourteenth Amendment Right to Due Process

Plaintiff Beebe's most compelling argument is that the issuance of citations by defendants has violated his right, under the Fourteenth Amendment, to hold specific private employment. (Ct.Rec. 92 at 8). This claim circumvents the plaintiff's inability to invoke the protection of the Treaty. Beebe provides the affidavit of his employer, plaintiff Richard Ramsey, who notes that if such citations continue to be issued to Beebe by defendants, he will not be able to employ Beebe. *See* Affidavit of Richard Kip Ramsey in Motion for Opposition to Third Summary Judgment at 2, attached to Plaintiff Beebe's Response to Third Motion for Summary Judgment (Ct.Rec. 92).

Plaintiff Beebe properly notes that "the right to hold specific private employment and to follow a chosen profession free from unreasonable interference comes within the 'liberty' and 'property' concepts" of the Fourteenth Amendment. *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959). Thus, it is undisputable that an individual may have a protected property interest in private employment, the deprivation of which can serve as the basis for a 42 U.S.C. § 1983 claim. *See Merritt v. Mackey*, 827 F.2d 1368, 1370 (9th Cir.1987). In order to establish a due process violation, the plaintiff must first show that he had more than a "unilateral expectation" of continuing employment, but also a "legitimate claim of entitlement." *Board of Regents v.*

---

**24.** This does not mean, as defendants suggest in their Reply Memorandum (Ct.Rec. 93 at 3), that non-members will necessarily be subject to state regulations once they venture off the reservation.

Rather, it merely shows that the party entitled to assert this right is the Yakama Indian Nation, not the non-members they employ.

*Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Merritt,* 827 F.2d at 1371. The employee must demonstrate a reasonable expectation based upon some external source such as state law. *Merritt,* 827 F.2d at 1371. In this case, Beebe points to the provisions of the TERO, which provides him, as an Indian, with preferential treatment regarding continued employment and promotion. This Tribal ordinance clearly provides him with the requisite entitlement necessary to implicate due process. Thus, defendants' interference with Beebe's employment would appear to state a cognizable claim under 42 U.S.C. § 1983 if such interference was "unreasonable."

However, the issuance of citations to Beebe was only "unreasonable" if he was not breaking the law[25] when he drove the Tiin–Ma Logging Company trucks, and that question necessarily requires interpretation of the Treaty right to travel. Suits based on the interpretation of treaty rights are not within the scope of § 1983. *See Hoopa v. Nevins,* 881 F.2d 657, 663 (9th Cir.1989), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990); *United States v. Washington,* 813 F.2d 1020, 1023 (9th Cir.1987), *cert. denied,* 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988).[26] The central purpose of this litigation is to determine the meaning of the travel provision of Article III. As the Ninth Circuit noted in the appeal regarding qualified immunity, the travel provision does not " 'specifically delineate the Indians' right to [use Washington's roadways free from licensing] in such a way that the nature and scope of that right is readily apparent." *Cree v. Waterbury,* No. 91–35882, 1993 WL 115230 at *2 (9th Cir. April 14, 1993) at 4.

Prior to this court's interpretation of the Article III travel right, it was unclear whether the Tribe could travel the public highways without paying licensing fees. Consequently, defendants' actions did not violate "well delineated rights" of either the Tribe or Beebe.[27] *See Washington,* 813 F.2d at 1023. As a result, neither the Tribe nor Beebe can maintain a claim under § 1983.[28] However, now that this court has specifically delineated those Treaty rights, future citations against Beebe could constitute "unreasonable interference" with his employment interest, which would give rise to a § 1983 claim.

### iii. Beebe Cannot State a Claim of Federal Preemption

In the complaint, plaintiff Beebe claims that the transportation of logs was preempted by virtue of the detailed scheme of federal regulation imposed by the federal government on the sale of the Yakama Nation's timber and due to the Indian Commerce Clause. *See* (Ct.Rec. 1 at 3–4). However, preemption analysis is not " 'controlled by mechanical or absolute conceptions of state or tribal sovereignty'; it requires a particularized examination of the relevant

**25.** The police do not, for example, violate a person's due process rights if they cite that person for disobeying the speed limit, even if the person is working at the time.

**26.** These cases also preclude plaintiff Beebe from successfully stating a 42 U.S.C. § 1983 claim based upon a deprivation of his Fourth Amendment rights. Such a deprivation must be grounded upon either the defendants' interference with the Treaty right or his right to be gainfully employed. Mr. Beebe has no rights under the former, and the latter derives from a previously ill-defined Treaty right which cannot provide the basis for a § 1983 claim.

**27.** Plaintiff Beebe suggests that the prior decisions of the Yakima County District Courts, which held the citations void, served to delineate these rights to defendants. (Ct.Rec. 92 at 9). However, the Ninth Circuit found that the fact of these prior decisions insufficient to establish

clearly a federal right. *Cree v. Waterbury,* No. 91–35882 (9th Cir. April 14, 1993) at 4. Consequently, Mr. Beebe cannot rely upon these prior decisions to establish that the interference with his right to employment was "unreasonable."

**28.** In their Second Motion for Summary Judgment, (Ct.Rec. 30), defendants moved to dismiss the remaining claims for injunctive relief under § 1983. However, this motion was later withdrawn without prejudice by Fronda Woods. Resolution of Mr. Beebe's Fourteenth Amendment claim requires the court to draw the conclusion that this case involves the interpretation of ill-defined treaty rights—a conclusion which not only eliminates Mr. Beebe's 42 U.S.C. § 1983 claim but also the 42 U.S.C. § 1983 claims of the remaining plaintiffs. In addition, if § 1983 is not available to the plaintiffs, then they cannot recover attorneys' fees under § 1988. *See United States v. Washington,* 813 F.2d 1020, 1023 (9th Cir.1987).

state, federal, and tribal interests." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); *Ramah Navajo School Bd. v. Bureau of Revenue*, 458 U.S. 832, 838, 102 S.Ct. 3394, 3398–99, 73 L.Ed.2d 1174 (1982). In determining whether a state's attempts at taxation upon Indian affairs have been preempted, "traditional notions of tribal sovereignty inform the preemption analysis that governs this inquiry." *White Mountain*, 448 U.S. at 143, 100 S.Ct. at 2583. However, while the concept of tribal sovereignty may be a strong factor in preemption analysis where the state attempts to tax on-reservation activity of Indians, it is firmly established that unless there is some federal source providing to the contrary, the state has the authority to impose its nondiscriminatory state laws upon Indians venturing outside of the reservation. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270–71, 36 L.Ed.2d 114 (1972). The factors weighed by courts in determining whether the state is preempted do not weigh as heavily once the boundaries of the reservation are crossed.[29]

■ Defendants also correctly point out that even if such preemption allegations have merit, they do not confer any "rights, privileges, or immunities" which are enforceable under 42 U.S.C. § 1983, the source of plaintiff's non-treaty claims. *See Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107–108, 110 S.Ct. 444, 449–50, 107 L.Ed.2d 420 (1989); *see also White Mountain Apache Tribe v. Williams*, 810 F.2d 844 (9th Cir. 1984), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). In *Williams*, the court noted that since the state tax did not violate any federal statute, it did not give rise to any right cognizable under § 1983. *Id.* at 852. Rather, the court stated that the tax on on-reservation activities had run afoul of the Supremacy Clause by interfering with the "authority and policies" of the federal government. *Id.* Plaintiff Beebe is similarly

precluded from grounding a 42 U.S.C. § 1983 claim upon preemption.[30]

**c. The Treaty Allows the Yakama Indian Nation to Exercise Its Right to Travel Free of Licensing and Permitting Fees Through the Use of Non–Members**

■ While the court thus finds that all of plaintiff Beebe's claims must be dismissed, the matter does not end here. In its March 16, 1993, order of stay, the court expressed its unwillingness to decide this previously unopposed summary judgment motion without receiving briefing regarding whether the Yakama Treaty, as a matter of law, allows the Tribe to exercise its travel right under the Treaty through the use of non-members. (Ct.Rec. 71 at 2). The court's anticipation of this issue was confirmed by the Yakama Indian Nation's Complaint in Intervention. (Ct.Rec. 134). In that complaint, the Tribe intervened in both the *Cree* and *Wheeler Logging* cases, and adopted the claims of those plaintiffs as its own. (Ct.Rec. 134 at 2). By incorporating the claims of Douglas Beebe in its own complaint, the Yakama Indian Nation raised the issue of whether the Tribe may exercise its right to travel under the Treaty, through the use of non-members.

The court notes that precedent regarding this issue is sparse, since this is the first case construing the travel provision of the Treaty. Both plaintiffs and defendants point to the following language of Judge Boldt as supportive of their claims:

[121] 20. Can a person who is not an enrolled member of a particular treaty tribe exercise, or assist in the exercise of, the treaty fishing right of, or on behalf of, a member of such tribe?

A. A treaty right fisherman may secure the assistance of other tribal fishermen with off reservation fishing rights in the same usual and accustomed places, whether or not such fishermen are members of the same tribe or another treaty tribe. A

---

**29.** The court recognizes and agrees with the Yakima County District Court's holding that the state's imposition of fees is not preempted by any federal (timber) regulatory scheme. *See* Memorandum Opinion at 4 attached to Local Rule 56 Statement of Material Fact (Ct.Rec. 64).

**30.** The court notes that the plaintiff, in his response brief (Ct.Rec. 92), fails to address the preemption claim or to rebut in any way defendants' challenges to this claim.

treaty right fisherman may also be assisted by his or her spouse, ... forebears, children, grandchildren and siblings.

*United States v. Washington,* 384 F.Supp. 312, 412 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Defendants contend that this language shows that only enrolled Yakamas can exercise Yakama Treaty fishing rights. (Ct.Rec. 63 at 6). Plaintiffs counter by pointing out that this language plainly states that such a rule is not absolute: *some* non–Tribal members can assist. (Ct.Rec. 92 at 3). This language is less important, however, than the grounds whereupon Judge Boldt was able to define the ·extent of this Tribal right.

The Ninth Circuit, in reviewing Judge Boldt's decision, noted that the court had appropriately exercised its "equitable discretion" in determining that the tribes had the power, subject to certain conditions, to regulate their own members freely. *United States v. Washington,* 520 F.2d at 686. Consequently, plaintiffs are correct in their assertion that this court may, in its discretion, define the permissible extent of the Tribe's autonomy in determining how its preserved Treaty right may be exercised.

In *Settler v. Lameer,* 507 F.2d 231 (9th Cir.1974), the court held that the Yakama Indian Nation had the authority to enforce its fishing regulations with respect to violations committed off-reservation by Tribal members, by arresting and trying such violators upon their return to the reservation. *Id.* at 238. Although its holding was narrow, the court further held that the Tribe could even enforce its regulations by off-reservation arrest and seizure. *Id.* at 240. The court based its holding on the observation that the "determination of when and how the [fishing] rights may be exercised is an 'internal affair' of the Tribe." *Id.* at 237; *see also United States v. Oregon,* 787 F.Supp. 1557, 1566 (D.Or.1992), *aff'd,* 29 F.3d 481 (9th Cir.

1994). Regulation of treaty preserved rights was one of the last "remnants of sovereignty" retained by the Tribe, and the fact that the exercise of the Treaty right was off-reservation was immaterial. *Id.*

The Ninth Circuit's holding in *Settler* shows that once the court identifies a Treaty right held by the Tribe, the Tribe is entitled to deference in determining how to exercise that right. In addition, the doctrine of tribal sovereignty supports an interpretation which allows the Yakama Indian Nation to use nonmembers in the exercise of the Article III travel right. Although this doctrine does not serve as an independent claim, it still exists as a "backdrop" against which Indian treaties must be read. *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 173, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1972). This doctrine favors an interpretation which allows the Tribe to regulate and articulate the boundaries of the Treaty right as its own internal matter.

However, just as Judge Boldt fashioned limitations on the fishing right through an exercise of the court's discretion, so too does this court qualify the travel right provided in Article III of the Treaty. The court limits the Tribe's ability to exercise its right to travel free of taxation solely to situations involving the hauling of *Tribal* goods.[31] Such an interpretation is not only within the court's equitable discretion, but is also warranted by the language of the Treaty minutes:

> You will be near the Great Road and can take *your* horses and *your* cattle down the river and to the Sound to market.
> You will be allowed to pasture your animals on land not claimed or occupied by settlers, white men. You will be allowed to go on the roads, to take *your* things to market, *your* horses and cattle (emphasis added).

Walla Walla Treaty Minutes, 57, 61. The imposition of this limitation on the nonexclu-

---

**31.** The parties address the scenario where the Yakamas, if allowed to employ non-members, suddenly become a massive corporation and begin hauling non-Tribal goods, thereby circumventing any taxation. *See* Plaintiff Beebe's Response To Third Motion for Summary Judgment (Ct.Rec. 92 at 6). Plaintiffs correctly note that

defendants present no evidence of any such conduct or intent on the part of the Tribe. However, in defining the scope of the Treaty provision, the court finds that it is entitled, as a matter of discretion, to preclude any potential marketing of a tax exemption.

sive travel right is consistent with the prior fishing decisions, in which the courts fashioned restrictions governing the Treaty right to fish as deemed necessary for the "conservation" of the resource. *See Tulee v. Washington,* 315 U.S. 681, 685, 62 S.Ct. 862, 864–65, 86 L.Ed. 1115 (1942); *United States v. Washington,* 384 F.Supp. at 342 (recognizing that some regulations of the nonexclusive right are permissible in order to conserve the fish resource).

In addition, while the court may interpret the Treaty travel provision as allowing the Tribe to travel the highways without paying licensing or permitting fees, the court emphasizes that in exercising its *nonexclusive* right, the Tribe must still comply with regulations imposed by the state which are designed to preserve and maintain the condition of the roads. *See Tulee,* 315 U.S. at 685, 62 S.Ct. at 864–65 (state could not impose licensing fees on Treaty right to fish but could still impose regulations designed to conserve the resource).

### d. Conclusion

The Article III travel right provides the Yakama Indian Nation with the ability to exercise its right in the manner it chooses, providing that it complies with the reasonable regulations imposed by the State of Washington designed to preserve and maintain the condition of the highways. Consequently, the Tribe has the right to employ non-members to drive Yakama–owned vehicles without being subject to licensing and permitting fees, so long as such drivers are engaged in the transportation of tribally owned goods. This right, does not belong to these non-members and cannot be asserted by them in their individual capacity.

The court recognizes that it cannot provide an exhaustive description of the extent of the Yakama Indian Nation's Treaty travel right in this order. Counsel for *Wheeler Logging* plaintiffs even concedes that there may be some circumstances where the Treaty exemption from state taxation should not apply. One example he provides is where a Yakama Tribal member doing business as a Tribally licensed business claims the Treaty protection for himself and his drivers despite the fact that he has only nominal title in the business or fails to participate actively in it.

(Ct.Rec. 172 at 4 n. 2). However, the court finds that such circumstances are not before it at this time and therefore are not appropriately resolved in this order.

### CONCLUSIONS:

While the court grants plaintiffs' prayer for declaratory relief in this order, it finds that it must deny the prayer for injunctive relief under 42 U.S.C. § 1983 and for attorneys' fees under 42 U.S.C. § 1988. However, the court emphasizes that this order provides a clear delineation of the Yakamas' Treaty right to travel. Defendants are thus put on notice that interference with this Treaty right through the issuance of citations simply for the failure to possess the statutory licenses and permits could subject them not only to future injunctive relief but also to potential suits under 42 U.S.C. § 1983 for damages.

### IT IS HEREBY ORDERED:

1. Defendants' motion for summary judgment dismissing plaintiffs' treaty claims is **DENIED.**

2. Defendants' motion for summary judgment regarding collateral estoppel is **DENIED.**

3. Defendants' motion for summary judgment dismissing the claims of Douglas Beebe is **GRANTED.**

4. Defendants' motion for summary judgment dismissing any claims based solely upon the doctrine of tribal sovereignty is **GRANTED.**

5. Plaintiffs' motion for summary judgment regarding the meaning of "in common with" is **GRANTED,** and the court **HEREBY DECLARES:**

6. Article III, ¶ 1 of the June 9, 1855 Treaty with the Yakamas provides the Yakama Indian Nation with the right to travel on all public highways without being subject to any licensing and permitting fees related to the exercise of that right, while engaged in the transportation of Tribally owned goods.

7. This Treaty right to travel, although secured to the Yakama Indian Nation, can be exercised by its individual members, and any Yakama–owned and operated corporation or business, which is Tribally licensed.

8. The Yakama Indian Nation has the autonomy to regulate and exercise this right,

**434**

including through the use of non-member agents or employees.

9. The Yakama Indian Nation, its members, any Yakama–owned or operated corporations or business, and any non-members engaged in the exercise of the Yakama Indian Nation's Treaty right to travel must comply with state regulations designed to preserve and maintain the public roads and highways to the extent that those regulations do not impose a fee or surcharge on the Treaty right to travel on said public roads or highways.

**IT IS SO ORDERED.** The Clerk is directed to enter this order and forward copies to counsel.